UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
————————————————————————————

STEVEN D. BURDICK,

                            Plaintiff,

                                                              5:16-cv-01393
v.                                                            (MAD/TWD)


TOWN OF SCHROEPPEL, et al.,

                            Defendants.
————————————————————————————

APPEARANCES:

STEVEN D. BURDICK
Plaintiff, *pro se*
4102 State Route 3
Fulton, New York 13069


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

*Pro se* Plaintiff Steven D. Burdick, presented his original 42 U.S.C. § 1983 civil rights

complaint for filing on November 21, 2016, along with an application to proceed *in forma*

*paupers* ("IFP application").  (Dkt. Nos. 1 and 2.)  Before this Court could undertake review of

the original complaint and IFP application, Plaintiff requested a two-week extension to file an

amended complaint, which was granted by Text Order on December 9, 2016.  (Dkt. No. 5.)

After failing to comply with the Court's deadline to file an amended complaint by December 23,

2016, by letter dated January 3, 2017, Plaintiff requested additional time to file an amended

complaint, which was granted by Text Order on January 4, 2017.  (Dkt. No. 7.)  Plaintiff timely

filed the amended complaint on January 18, 2017.  (Dkt. No. 9.)  By letter dated January 19,

2017, Plaintiff requested an extension to file additional exhibits in support of the amended complaint, which was granted by Text Order on January 20, 2017.  (Dkt. No. 10.)  Plaintiff timely filed the additional exhibits on January 25, 2017.  (Dkt. No. 12.)

For the reasons that follow, the Court grants Plaintiff's IFP application (Dkt. No. 2) and recommends the *sua sponte* dismissal of the amended complaint (Dkt. Nos. 9) without leave to amend.

## I.      IFP APPLICATION

A court may grant *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action.  28 U.S.C. § 1915(a)(1) (2006).  After reviewing Plaintiff's IFP application, the Court finds that Plaintiff meets this standard.  Therefore, Plaintiff's IFP application (Dkt. No. 2) is granted.[1]

## II.     LEGAL STANDARD FOR INITIAL REVIEW

Even when a plaintiff meets the financial criteria for *in forma pauperis*, 28 U.S.C. § 1915(e) directs that when a person proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).  "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an

---

[1]  Plaintiff should note that although the IFP application is granted, Plaintiff will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (citations and internal quotation marks omitted). Although extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *See, e.g.*, *Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (per curiam) (holding that a district court has the power to dismiss a complaint *sua sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me accusation." *Id.*

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Where a plaintiff proceeds *pro se*, the pleadings must be read liberally and construed to raise the strongest arguments they suggest. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185,

191 (2d Cir. 2008) (citation omitted).  A *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted).  An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## III.    PLAINTIFF'S AMENDED COMPLAINT

Plaintiff has sued Oswego County, the Town of Schroeppel, Schroeppel Town Justice Armen J. Nazarain,[2] Oswego County Court Judge Donald Todd ("Judge Todd"), Oswego County Commissioner of Jurors James G. Cloonan ("Cloonan"), and Salvatore Lanza, Esq. ("Lanza") alleging numerous violation of his civil rights under the Fifth, Sixth, and Fourteenth Amendments.  (*See generally* Dkt. No. 9.)

On October 14, 2011, Plaintiff was arrested at his home located in Palermo, New York, and charged with cruelty to an animal, endangering the welfare of a child, and resisting arrest. *Id.* at ¶ 11.[3]  Plaintiff was arraigned in the Town of Palermo Court.  *Id.* at ¶ 27.  Thereafter, Palermo Town Justices Robert Wood and Jean Hart each recused themselves for conflict of interest.  *Id.* at ¶ 28.  Plaintiff maintains Palermo Town Justice Jean Hart improperly recused herself, and, thus, jurisdiction of his criminal case was improperly transferred to Justice Nazarian in the Town of Schroeppel.  *Id.*  On November 21, 2013, more than two years after his arrest,

---

[2]  Plaintiff has transposed two letters of Defendant's surname.  (Dkt. No. 12-1 at 1.)  The Court will use the correct spelling, "Nazarian" and refer to Defendant as "Justice Nazarian" throughout this Order and Report-Recommendation.

[3]  Plaintiff's claims against the New York State Troopers involved in his October 14, 2011, arrest are the subject of a separate action filed by the Carroll Law Firm in the Northern District of New York, *Burdick v. Kurilovitch*, No. 5:14-cv-01254 (BKS/TWD), on October 14, 2014.

Plaintiff's criminal trial was held in the Town of Schroeppel Justice Court. *Id*. Plaintiff alleges Oswego County, the Town of Schroeppel, and Justice Nazarian deprived Plaintiff of his right to a speedy and impartial trial. *Id*.

Plaintiff retained Lanza as defense counsel. *Id*. at ¶ 14. However, on November 13, 2013, during a pre-trial appearance, Plaintiff advised Justice Nazarian that he wished to proceed *pro se* after revealing that he was in "major disagreement" with Lanza regarding trial strategy. *Id*. at ¶ 34. Justice Nazarian denied Plaintiff's request. *Id*.

Plaintiff's trial commenced November 21, 2013. *Id*. at ¶ 16. As an initial matter, Plaintiff alleges Cloonan, Oswego County, and the Town of Schroeppel violated Plaintiff's right to due process and equal protection of law by improperly selecting his jury pool. *Id*. at ¶ 29. Specifically, Plaintiff alleges Cloonan selected a pool of only sixteen jurors, instead of the customary practice of selecting a pool of twenty-five jurors, which "severely limited potential jurors that could be excused for cause by the court." *Id*. Plaintiff further alleges that his jury pool was not a "cross-section of jurors in Oswego County" because all of the potential jurors were residents of the Town of Schroeppel. *Id*.

Next, Plaintiff alleges Justice Nazarian failed to properly dismiss several potential jurors for cause, thereby violating Plaintiff's right to a fair and impartial jury. *Id*. at ¶¶ 30-32. Specifically, Justice Nazarian failed to dismiss juror Steven Chapburn for cause because of Chapman's personal friendship with Justice Nazarian. *Id*. at ¶ 31. Justice Nazarian also failed to dismiss alternate juror Gary Borland for cause because of Borland's personal relationship with the jury foreperson. *Id*. at ¶ 32. In addition, Justice Nazarian failed to dismiss for cause all potential jurors that had family members in the law enforcement or legal professions, were neighbors of Plaintiff, and that had read about Plaintiff in the newspaper. *Id*. at ¶ 33.

Plaintiff claims Lanza provided ineffective assistance of counsel by, *inter alia*, preventing Plaintiff from testifying at trial and failing to present factual and character witnesses, along with other evidence, that would have been favorable to Plaintiff. *Id*. at ¶¶ 35-37. Moreover, Lanza "rested" over Plaintiff's objections, thereby depriving Plaintiff of his right to continue the trial to the next day so he could testify on his own behalf and present evidence. *Id*. According to Plaintiff, Lanza also made derogatory and threatening comments about Plaintiff and his daughter on social medial one week before trial. *Id*. at ¶ 34. Lanza also spoke to and about Plaintiff with a demeaning attitude and tone throughout the trial. *Id*. at ¶ 37.

Plaintiff alleges Oswego County and Justice Nazarian discriminated against Plaintiff and violated the Americans with Disabilities Act ("ADA") 42 U.S.C. 12101, et seq., by refusing to grant Plaintiff necessary and reasonable accommodations in pre-trial court proceedings and during the trial. *Id*. at ¶ 44. According to Plaintiff, Justice Nazarian was fully aware that Plaintiff is physically disabled after being struck by a car in 1984. (Dkt. No. 9-7.) Justice Nazarian admonished Plaintiff for changing body positions during trial and denied Plaintiff's request to continue the trial for a second day. According to Plaintiff, he needed time to resolve issues with Lanza and also to recuperate physically and mentally before testifying on his own behalf and calling character witnesses. (Dkt. No. 9 at ¶ 38.)

Plaintiff alleges Justice Nazarian's charge to the jury was improper and confusing. *Id*. at ¶ 39. At the end of the one day trial, the jury found Plaintiff guilty of resisting arrest and cruelty to an animal, and not guilty of endangering the welfare of a child. *Id*. at ¶ 17.

Thereafter, Justice Nazarian violated Plaintiff's rights by denying his 330.30 motion to vacate the judgment and sentence. *Id*. at ¶¶ 18, 40. On March 19, 2014, the Town of Schroeppel and Justice Nazarian denied Plaintiff access to his relevant appeal documents when Plaintiff

appeared to settle the record on appeal by, *inter alia*, directing Plaintiff to leave his box of relevant documents in the hallway. *Id*. at ¶ 42. Thereafter, on October 13, 2014, Justice Nazarian refused to accept Plaintiff's affidavit of errors and sent the record "as is" to the Oswego County Court. *Id*. at ¶ 41. Plaintiff's appeal to the Oswego County Court was denied by Judge Todd on June 29, 2016, because the affidavit of errors was omitted from the record. *Id*. at ¶¶ 20-22. Plaintiff further alleges Judge Todd failed to recuse himself based on several conflicts of interest. *Id*. at ¶ 43. According to Plaintiff, he has timely filed a notice of appeal with the Appellate Division. *Id*. at ¶ 23.

Plaintiff alleges Oswego County and the Town of Schroeppel are responsible for the acts and omissions of its officials, agents, employees, and officers based on a theory of *respondent superior*. *Id*. at ¶ 44. Plaintiff further alleges the Town of Schroeppel and Oswego County failed to train its elected and appointed judges and officials, directly participated in and endorsed all of the unconstitutional and unlawful customs, policies, practices, and conduct of its agents and employees, and that both were aware of the long-standing unconstitutional and unlawful customs and practices. *Id*. at ¶¶ 45-48. Plaintiff further maintains Judge Todd should not be a judge in Oswego County because his twin brother, Oswego County Sheriff Ruell Todd is "the top cop" in Oswego County. *Id*. at ¶ 45.

Plaintiff provides an extensive "background history of the parties" in which he claims Oswego County and its officials have been harassing Plaintiff since he campaigned as a candidate for Legislator in 2008. *Id*. at ¶ 24. Plaintiff claims Oswego County and its officials falsely charged and arrested Plaintiff in 2009, and after extensive litigation, the charges stemming from the 2009 arrest were dismissed in April 2016. *Id*. Plaintiff further alleges Oswego County and the Oswego County Sherriff's Department discriminated against him by not

referring "towing jobs" to Plaintiff, even though his family's towing business was registered with the Sheriff's Department. *Id*. Plaintiff alleges all Defendants subjected Plaintiff to disparate treatment and otherwise discriminated against him in retaliation for Plaintiff's prior outspoken public criticism of Defendants in private and public forums, as well as published media. *Id*. at ¶ 53.

Based on the above, Plaintiff alleges that Defendants, either directly or by *respondent superior*, violated Plaintiff's right to due process under the law and his right to equal treatment and protection of the laws guaranteed to him under the Fifth, Sixth, and Fourteenth Amendments. *Id*. at ¶¶ 45-48. Plaintiff seeks compensatory and punitive damages totaling $10,000,000, as well as interest, attorney's fees, injunctive relief, and declaratory relief. *Id*. at ¶ 54.

## IV.  ANALYSIS

### A.  *Heck v. Humphrey*

Civil lawsuits may not be used to collaterally attack criminal convictions. *Heck v. Humphrey*, 512 U.S. 477 (1994). In *Heck*, the Supreme Court held that:

> in order to recover damages for [an] allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

512 U.S. 477, 486-87 (1994). Under *Heck* and its progeny, a "§ 1983 action is barred (absent prior invalidation)--no matter the relief sought (damages or equitable relief) . . .--*if* success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005) (emphasis in original).

In this case, Plaintiff's claims, such as, jury pool selection, *voir dire*, jury charges, ineffective assistance of counsel, and appeals represent challenges that fall squarely within the ambit of *Heck*.  Were Plaintiff to succeed on those claims it would necessarily call into question the validity of his 2013 conviction.  As such, Plaintiff's claims are barred because Plaintiff has failed to show that his conviction has been overturned.  *See Duamutef v. Morris*, 956 F. Supp. 1112, 1115-18 (S.D.N.Y. 1997) (dismissing § 1983 claims under *Heck* where the plaintiff's underlying conviction had not been overturned).

Because Plaintiff's § 1983 claims are barred under *Heck*, the Court recommends dismissal of the amended complaint for failure to state a claim on which relief may be granted. 28 U.S.C. § 1915(e)(2)(B)(ii).

**B.    Judicial Immunity**

It is well settled that judges are absolutely immune from suit for any actions taken within the scope of their judicial responsibilities. *Mireles v. Waco*, 502 U.S. 9, 9-10 (1991).  Judicial immunity has been created for the public interest in having judges who are "'at liberty to exercise their functions with independence and without fear of consequences.'" *Huminski v. Corsones*, 396 F.3d 53, 74 (2d Cir. 2005) (quoting *Pierson v. Ray*, 386 U.S. 547, 554 (1967)). The Supreme Court has "generally concluded that acts arising out of, or related to, individual cases before the judge are judicial in nature." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009). Moreover, judicial immunity applies even when the judge is accused of acting maliciously or corruptly. *Imbler v. Pachtman*, 424 U.S. 409, 419 n.12 (1976) (citing *Pierson*, 386 U.S. at 553-554).  Judicial immunity is immunity from suit, not just immunity from the assessment of damages. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

Here, Plaintiff has sued Justice Nazarian and Judge Todd for actions that are unquestionably judicial acts. Moreover, Plaintiff's cursory and speculative references to the ADA does not compel a different result. *See, e.g.*, *Sabin v. Camp*, No. 7:12-CV-1370 (GLS/DEP), 2013 WL 785534, at *2-3 (N.D.N.Y. Feb. 5, 2013) (dismissing the plaintiff's claims under 42 U.S.C. § 1983 and the ADA against a town justice based on judicial immunity finding town justice protected from suit by judicial immunity where judge's conduct fell under his judicial duties); *DuQuin v. Kolbert*, 320 F. Supp. 2d 39, 40 (W.D.N.Y. 2004) (same).[4]

Accordingly, Justice Nazarain and Judge Todd are entitled to absolute immunity from suit. Because better pleading would not cure this defect, the Court recommends dismissing Plaintiff's claims against Justice Nazarain and Judge Todd with prejudice.

## C.    Private Action

Section 1983 permits a person to recover damages for the deprivation of constitutional rights "under color of any statute, ordinance, regulation, custom, or usage of any State or Territory." 42 U.S.C. § 1983 (2012). It is well established that criminal defense attorneys, whether private or court-appointed, are not state actors for the purposes of § 1983. *Rodriguez v. Weprin*, 116 F.3d 62 (2d Cir. 1997); *Fermin v. Moriarty*, No. 96 Civ. 3022(MBM), 2003 WL 21787351, at *3 (S.D.N.Y. Aug. 4, 2003). Accordingly, Plaintiff's claims against Lanza are not cognizable under § 1983. Because better pleading would not cure this defect, the Court recommends dismissing Plaintiff's claims against Lanza with prejudice.

---

[4] Copies of unpublished decisions will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

D.    *Res Judciata*

This is not Plaintiff's first civil rights action against Oswego County and the Town of

Schroeppel arising from his November 21, 2013, trial.  In *Burdick v. Oswego County*, No. 5:15-

cv-00353 (MAD/TWD) ("*Burdick I*"), Plaintiff sued Oswego County and the Town of

Schroeppel on a theory of *respondeat superior* for the actions of their employees and agents,

including Justice Nazarian, Judge Todd, and Lanza, as a result of their widespread

unconstitutional and unlawful customs, policies, and practices.  (*Burdick I*, Dkt. No. 1 at ¶ 11.)

Relevant to the instant action, in *Burdick I*, Plaintiff alleged that "numerous procedural

errors were committed by the trial court."  *Id*. at ¶ 16.  Specifically, Plaintiff claimed Justice

Nazarian failed to excuse juror Steve Chapburn during *voir dire*, ignored Plaintiff's pleas and

objections, and refused to recuse himself from presiding over the retrial of Plaintiff's 2011

criminal case.  *Id*. at ¶¶ 17-18.  Plaintiff claimed Justice Nazarian and Lanza, together and

separately, deprived Plaintiff of his due process rights by refusing to allow Plaintiff to present

factual and character witnesses in support of his defense and to testify on his own behalf.  *Id*. at ¶

18.  Further, even though Plaintiff advised Justice Nazarian that he "would need another day of

trial" to present his witnesses that were "on call/standby," Justice Nazarian permitted Lanza to

"rest" and refused Plaintiff's request to continue the trial.  *Id*. at ¶ 19.[5]

Plaintiff alleged Lanza provided ineffective assistance of counsel at trial.  *Id*. at ¶ 21.

Specifically, Lanza failed to object to the trial court's failure to dismiss a potential juror with

cause, and that he refused to call any witnesses for Plaintiff.  *Id*. at ¶ 19.

---

[5] Although Plaintiff's complaint in *Burdick I* was not a model of clarity and Plaintiff failed to
specify the "trial court" that allegedly committed the "numerous procedural errors," the Court
stated "[t]he allegations of Justice Nazarian's misconduct all presumably arise from Plaintiff's
2013 Criminal Case, over which Justice Nazarian presided."  (*Burdick I*, Dkt. No. 24 at 13 n.3.)

Further, Plaintiff alleged Judge Todd refused to recuse himself from hearing Plaintiff's appeal on his 2013 criminal case. *Id.* at ¶ 40. Indeed, Plaintiff argued Judge Todd had a conflict of interest because Plaintiff had sued Judge Todd's twin brother, Oswego County Sheriff Ruell Todd, in another civil rights action. *Id.*

In *Burdick I*, Plaintiff also provided an overview of the "procedural history" between the parties. There, Plaintiff explained he has been subjected to illegal, discriminatory, and retaliatory acts by Oswego County because of his prior public and published criticism of New York State, New York State Police, Oswego County Sheriff's Department, Oswego County Government, Oswego County Department, and all of their employees and agents, regarding their respective policies and procedures, such as being deprived of income when he was denied "tow assignments" from the various police departments. *Id.* at ¶ 23.

Plaintiff further alleged that his claims in *Burdick I* were based on "past and continuing and ongoing harm and injury caused by the Defendants(s) in its discriminatory and retaliatory acts and policies." *Id.* at ¶ 24. Plaintiff alleged since his false arrest and false imprisonment on November 22, 2009, Oswego County had engaged in a "continuous campaign of defamation of character, malicious prosecution, and harassment and intimidation" of Plaintiff. *Id.* at ¶ 25.

By Memorandum-Decision and Order, dated October 29, 2015, United States District Judge Mae A. D'Agostino dismissed the complaint in its entirety. (*Burdick I*, Dkt. No. 24.) Specifically, the Court found Plaintiff failed to plead a plausible connection between any of the alleged wrongdoing of the individuals mentioned in the complaint and the policies or practices of Oswego County of the Town of Schroeppel. *Id.* at 10. The Court further held Plaintiff incorrectly pleaded that Oswego County and the Town of Schroeppel were responsible through

*respondeat superior* for the Office of the Oswego County District Attorney and the actions of Justice Nazarian, respectively. *Id.*

Next, the Court found Plaintiff's conclusory allegation that Oswego County and the Town of Schroeppel were aware of and encouraged "unconstitutional and unlawful customs, policies, practices, and conduct of its agents and its employees," such as being "aware" that the "Oswego County Judiciary and the Town of Schroeppel Justice Court deliberately and/or negligently failed to take action to correct the unlawful customs, policies, practices and conduct of the Office of Oswego County Court Judge Donald Todd" were not sufficient to withstand a motion to dismiss. *Id.*

Further, the Court noted that local justice courts and courts of the 5th Judicial District are supervised by the Deputy Chief Administrative Judge for the Courts outside New York City, rather than by the municipality in which they sit. *Id.* at 11. Accordingly, the Court dismissed all claims against Oswego County and the Town of Schroeppel based upon the actions of the Oswego County Judiciary, Town of Schroeppel Justice Court, Judge Todd, Justice Nazarian, and the Oswego County District Attorney's Office. *Id.*

The Court next considered whether the actions of Justice Nazarian, Judge Todd, and Lanza violated Plaintiff's rights to due process. *Id.* at 12. Notwithstanding Plaintiff's inability to establish a plausible connection between Justice Nazarian and Judge Todd's actions against the policies or customs of Oswego County and the Town of Schroeppel, the Court held Justice Nazarian and Judge Todd's were entitled to absolute judicial immunity. *Id.* at 12-13. The Court held that a criminal defense attorney is not subject to suit under 42 U.S.C. § 1983. *Id.* at 13. Therefore, the Court dismissed all claims arising from the actions of Justice Nazarian, Judge Todd, and Lanza.

Moreover, the Court dismissed all claims that "were mere repetitions of each general claim against [Oswego] County" filed in the Northern District of New York in *Burdick v. Oswego County*, No. 5:12-cv-01711 (NAM/DEP) (the "2012 Civil Action"). *Id.* at 14. Lastly, the Court abstained from considering Plaintiff's Sixth Amendment claim. *Id.* at 15.

Accordingly, Plaintiff's complaint in *Burdick I* was dismissed with prejudice for all claims except Plaintiff's Sixth Amendment right to a speedy trial, which was dismissed without prejudice. *Id.* at 15. Judgment in favor of Oswego County and the Town of Schroeppel against Steven D. Burdick was entered by the Clerk of Court on October 29, 2015. (*Burdick I*, Dkt. No. 25.)

There are limits as to how often the Court can be asked to review the same allegations against the same parties. That limitation is manifested in the doctrine of *res judicata*. *See Salahuddin v. Jones*, 992 F.2d 447, 449 (2d Cir. 1993). "Under the doctrine of *res judicata*, once a final judgment has been entered on the merits of a case, that judgment will bar any subsequent litigation by the same parties or those in privity with them concerning the transaction, or series of connected transactions, out of which the [first] action arose." *Cieszkowska v. Gray Line New York*, 295 F.3d at 204, 205 (2d Cir. 2002) (quoting *Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 97 (2d Cir. 1997)) (internal quotation marks omitted) (alterations in original); *accord Waldman v. Village of Kiryas Joel*, 207 F.3d 105, 108 (2d Cir. 2000). In other words, later actions will be *res judicata* and subject to dismissal if "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the [parties] or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Pike v. Freeman*, 266 F.3d 78, 91 (2d Cir. 2001) (quoting *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284-85 (2d Cir. 2000)) (internal quotation marks omitted) (alterations in original).

The doctrine of *res judicata* applies to *pro se* litigants.  *Yeiser v. GMAC Mortgage Corp.*, 535 F. Supp. 2d 413, 426 (S.D.N.Y.2008) (citing *Pena v. Travis*, No. 01-CV-8534, 2002 WL 31886175, at *8 (S.D.N.Y. Dec. 27, 2008)).  Moreover, a district court may *sua sponte* raise the issue of *res judicata*.  *See Rollock v. LaBarbera*, 383 F. App'x 29, 30 (2d Cir. 2010) (citing *Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 398 n.4 (2d Cir. 2003) ("[A] court is free to raise [the] defense [of *res judicata*] *sua sponte*[.]")).  When an *in forma pauperis* action is *res judicata*, it fails to state a claim upon which relief may be granted and thus § 1915(e)(2)(B) compels its dismissal."  *Lopez v. Jet Blue Airways*, No. 12-CV-0057 (JG), 2012 WL 213831, at *1 (E.D.N.Y. Jan. 24, 2012).

Here, as set forth above, Plaintiff has alleged the same nucleus of facts in the instant case as he alleged in *Burdick I* against Oswego County and the Town of Schroeppel.  Because *Burdick I* was adjudicated on the merits, Plaintiff's claims against Oswego County and the Town of Schroeppel are barred under the doctrine of *res judicata*.

### E.    Whether to Permit Amendment

A *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted).  An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

Here, leave to amend would be futile due to the bars imposed by *Heck*, judicial immunity, and *res judicata*.  Because the deficiencies are substantive in nature and extend beyond the mere

sufficiency of Plaintiff's amended complaint, the Court recommends dismissing the amended complaint in its entirety without leave to amend. [6]

"Disposition of the case on *Heck* grounds, however, warrants only dismissal *without* prejudice, because the suit may be reinstated should [the] plaintiff's conviction be 'expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.'" *Amaker v. Weiner*, 179 F.3d 48, 52 (2d Cir. 1999) (emphasis in original) (quoting *Heck*, 512 U.S. at 487).

However, for the reasons set forth above, the Court recommends dismissing Plaintiff's claims against Justice Nazarian, Judge Todd, Oswego County, and the Town of Schroeppel with prejudice.

## F.     Supplemental Jurisdiction

Plaintiff claims this Court has supplemental jurisdiction over claims arising under the New York State Constitution and common law.  (Dkt. No. 9 at ¶ 1.)  Inasmuch as the Court is recommending that Plaintiff's federal claims be dismissed, it also recommends that the District Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims without prejudice subject to refiling in state court and to reconsideration in the event the District Court does not accept this Court's recommendation for dismissal of Plaintiff's § 1983 claims without prejudice.  *See Kolari v. New York Presbyterian Hosp.*, 445 F.3d 118, 120 (2d Cir. 2006) (district court has discretion to decline to exercise supplemental jurisdiction over state law claims because all claims over which the federal court has original jurisdiction have been dismissed).

**WHEREBY**, it is hereby

---

[6]  Because the Court recommends dismissing Plaintiff's § 1983 claims as barred by *Heck*, judicial immunity, and *res judicata*, no determination has been made as to the merits of Plaintiff's claims.

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 2) is **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's amended complaint (Dkt. No. 9) be **DISMISSED WITHOUT LEAVE TO AMEND** as barred under *Heck v. Humphrey*, 512 U.S. 477 (1994); and it is further

**RECOMMENDED** that Plaintiff's § 1983 claims against Justice Nazarian, Judge Todd, Oswego County, and the Town of Schroeppel be **DISMISSED WITH PREJUDICE**; and it is further

**RECOMMENDED** that the District Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims; and it is further

**ORDERED** that the Clerk serve a copy of this Order and Report-Recommendation on Plaintiff, along with copies of the unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[7]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: January 31, 2017
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[7]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2013 WL 785534
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jon C. SABIN, Plaintiff,

v.

Robert CAMP, Individually and as Justice

of the Town of Pierrepont, [1] Defendant.

[1]   Based upon publically available information, the court has ascertained that the Justice is a defendant of Pierrepont. The Clerk is directed to therefore amend the court's records to reflect this change.

Civil Action No. 7:12–CV–1370 (GLS/DEP).

|

Feb. 5, 2013.

**Attorneys and Law Firms**

Jon C. Sabin, South Colton, NY, pro se.

None, for Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1**   Currently pending before me for review are a civil rights complaint and accompanying *in forma pauperis* ("IFP") application submitted for filing by *pro se* plaintiff Jon C. Sabin. [2] For the reasons set forth below, I conclude that, while plaintiff has demonstrated his entitlement to proceed *in forma pauperis,* his complaint lacks sufficient allegations to permit the court to determine whether he has stated a plausible claim against the defendant, and therefore recommend that it be dismissed, with leave to replead.

[2]   Plaintiff is a familiar litigant to this court, having filed six other lawsuits in this district. Plaintiff was given leave to proceed *in forma pauperis* in each of the actions. *See Sabin v. Arthurs, et al.,* No. 7:12–CV–1519 (N.D.N.Y. filed Oct. 3, 2012) (pending); *Sabin v. Nelson,* 7:12–CV–1373 (N.D.N.Y. filed Sept. 4, 2012) (pending); *Sabin v. Wozniak,* 7:00–CV–1875, 7:00–CV–1876, 7:00–CV–1877 (consolidated), (N.D.N.Y.

filed Dec. 6, 2000) (dismissed pursuant to Rule 41 of the Federal Rules of Civil Procedure); *Sabin v. Knowlton, et al.,* 7:00–CV–1893 (N.D.N.Y. filed Dec. 8, 2000) (settled).

I.  *BACKGROUND*

On August 31, 2012, the court received from plaintiff a complaint, accompanied by a motion for leave to proceed I FP. Dkt Nos. 1, 2. Plaintiff's complaint names Robert Camp as the sole defendant, both individually, and in his official capacity as a Justice of the Town of Pierrepont. Complaint (Dkt. No. 1) at ¶ 3. The only allegations set forth in plaintiff's complaint are that plaintiff is a "severe [epileptic] and cardiac patient" and that he is "prescribed a service dog" for his epilepsy. *Id.* at ¶ 4. As relief, plaintiff requests the entry of an order directing defendant and the Town of Pierrepont Justice Court to comply with the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102 *et seq. Id.* at ¶ 7.

II.  *DISCUSSION*

A.  *Plaintiff's IFP Application*

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $350, must ordinarily be paid. 28 U.S.C. §§ 1914(a). A court is authorized, however, to permit a litigant to proceed IFP if it is determined that he is unable to pay the required filing fee. [3] 28 U.S.C. § 1915(a)(1).

[3]   The language of that section is ambiguous because it suggests an intent to limit availability of IFP status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria. *Hayes v. United States,* 71 Fed. Cl. 366, 367 (Fed.Cl.2006); *see also Fridman v. City of New York,* 195 F.Supp.2d 534, 536 n. 1 (S.D.N.Y.2002).

In this instance, having reviewed plaintiff's IFP application, I conclude that he meets the requirements for IFP status. His application for leave to proceed *in forma pauperis* is therefore granted.

B.  *Sufficiency of Plaintiff's Complaint*

1. *Standard of Review*

Because I have found that plaintiff meets the financial criteria for commencing this case IFP, I must next consider the sufficiency of the claims set forth in his complaint in light of 28 U.S.C. § 1915(e). Section 1915(e) directs that, when a plaintiff seeks to proceed *in forma pauperis*, "(2) ... the court shall dismiss the case at any time if the court determines that—... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e) (2)(B). That section imposes a gatekeeping responsibility upon the court to determine whether an action may be properly maintained before permitting a plaintiff to proceed *in forma pauperis*. *Id.*

In deciding whether a complaint states a colorable claim, a court must extend a certain measure of deference in favor of *pro se* litigants, *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir.1990) (per curiam), and extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to address the sufficiency of plaintiff's allegations. *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir.1983). However, the court also has an overarching obligation to determine that a claim is not legally frivolous before permitting a plaintiff to proceed. *See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir.2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' " *Aguilar v. United States*, Nos. 99–MC–0304, 99–MC–0408, 1999 WL 1067841, at *2 (D.Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir.1998)); *see also Neitzke v. Williams*, 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir.1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory, for the purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint."). [4], [5]

[4]    "Dismissal of frivolous actions pursuant to 28 U.S.C. § 1915(e) is appropriate to prevent abuses of the

process of the court, as well as to discourage the waste of judicial resources." *Nelson v. Spitzer,* No. 07–CV–1241, 2008 WL 268215, *1 n. 3 (N.D .N.Y. Jan. 29, 2008)* (McAvoy, J.) (internal citations omitted).

[5]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

**\*2** When reviewing a complaint under section 1915(e), the court looks to applicable requirements of the Federal Rules of Civil Procedure for guidance. Specifically, Rule 8 of the Federal Rules of Civil Procedure provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The purpose of Rule 8 " 'is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable.' " *Powell v. Marine Midland Bank,* 162 F.R.D. 15, 16 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting *Brown v. Califano,* 75 F.R.D. 497, 498 (D.D.C.1977)) (italics omitted).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Although the court should construe the factual allegations in a light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal,* 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly,* 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed.R.Civ.P. 8(a)(2)).

2. *Individual Capacity Liability*

Plaintiff's complaint asserts a claim against defendant Camp, both individually and in his capacity as a Pierreport Town Justice. It is well-established, however,

Sabin v. Camp, Not Reported in F.Supp.2d (2013)
2013 WL 785534
Case 5:16-cv-01393-MAD-TWD    Document 13    Filed 01/31/17    Page 20 of 46

that the ADA does not contemplate lawsuits against state and other municipal officials in their individual capacities. *Garcia v. SUNY Health Svcs. Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001), *accord, Alster v. Goord,* 745 F.Supp.2d 317, 337 (S.D.N.Y.2010). I therefore recommend dismissal of plaintiff's claims against defendant Camp in his individual capacity.

### 3. *Official Capacity Liability: Judicial Immunity*

"It is well settled that judges are absolutely immune from suit for any actions taken within the scope of their judicial responsibilities." *DuQuin v. Kolbert,* 320 F.Supp.2d 39, 40–41 (W.D.N.Y.2004) (citing *Mireles v. Waco,* 502 U.S. 9, 10, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991)); *see also Young v. Selsky,* 41 F.3d 47, 51 (2d Cir.1994). This is true, however erroneous an act may have been, and however injurious its consequences were to the plaintiff. *Young,* 41 F.3d at 51. Judicial immunity, while broad, is not limitless; "a judge is immune only for actions performed in his judicial capacity." *DuQuin,* 320 F.Supp.2d at 41.

**\*3** In this instance, plaintiff's complaint contains no allegations from which the court may determine whether defendant Camp's alleged conduct giving rise to this action were in furtherance of his judicial capacity, rather than, for example, his administrative or investigative capacities. *See generally* Complaint (Dkt. No. 1). To reiterate, plaintiff's complaint contains only two allegations: that he is epileptic and a cardiac patient, and that he needs a service dog as a result of his epilepsy. *Id.* at ¶ 4. Because plaintiff's complaint fails to allege facts plausibly suggesting that defendant Camp's alleged conduct giving rise to this action was outside of his judicial capacity, I find that defendant Camp is protected from suit by judicial immunity. *See, e.g., DuQuin,* 320 F.Supp. att 41 (dismissing the plaintiff's claims under 42 U.S.C. § 1983 and the ADA against a town justice based on judicial immunity); *Badillo–Santiago v. Andreu–Garcia,* 70 F.Supp.2d 84, 91 (D.P.R.1999) (dismissing ADA claim against defendant-judge on the basis of judicial immunity because the court found that the judge's conduct fell under his judicial duties, rather than his administrative). For this reason, I recommend that plaintiff's complaint be dismissed.

### 4. *The Merits of Plaintiff's ADA Claim Against Defendant Camp in his Official Capacity* [6]

[6] The court has construed plaintiff's complaint to assert a claim under Title II of the ADA. To the extent that plaintiff's complaint could be construed as asserting a Title I ADA claim, I recommend dismissal of that claim, as well. Plaintiff's complaint fails to allege any facts plausibly suggesting that he is, or was, an employee of defendant Camp at any time. *See generally* Complaint (Dkt. No. 1); *see also Padilla v. New York State Dep't of Labor,* No. 09–CV–5291, 2010 WL 3835182, at *3 (S.D.N.Y. Sept. 13, 2010) ("To plead a Title I violation, a plaintiff must allege that (1) the defendant is subject to the ADA; (2) he is "disabled" within the meaning of the statute or perceived to be so by his employer; (3) he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (4) he was subject to an adverse employment action because of his disability.").

Title II of the ADA provides, in pertinent part, that

> [n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. The term "public entity" is defined to include "any department, agency, special purpose district, or other instrumentality of a State or States or local government[.]" 42 U.S.C. § 12131(1)(B). The United States Department of Justice has clarified, by regulation, that "a public entity should operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and useable by individuals with disabilities." 28 C.F.R. § 35.150(a).

To state a claim under Title II of the ADA, a plaintiff must allege "that (1) he or she is a qualified individual with a disability; (2) ... the defendants are subject to the ADA; and (3) ... plaintiff was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of plaintiff's disabilities." *Shomo v. City of New York,* 579 F.3d 176, 185 (2d Cir.2009) (internal quotation marks and alterations omitted). The term "qualified individual with a disability" is statutorily defined to mean

an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

**\*4** 42 U.S.C. § 12131(2).

In this action, plaintiff's complaint lacks sufficient factual allegations to determine whether his claim can satisfy any or all of these requirements. For example, although plaintiff's complaint alleges that he is an epileptic and a cardiac patient, this does not satisfy the first element of the inquiry. Complaint (Dkt. No. 1) at ¶ 4. The term "disability" is defined as follows:

The term 'disability' means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or more life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment (as described [elsewhere in the statute].

42 U.S.C. § 12102(1). A plaintiff's complaint must plead facts plausibly suggesting that his alleged disability can meet all of the elements contained in the ADA's definition of disability. See *Thompson v. New York City Dep't of Probation,* No. 03–CV–4182, 2003 WL 22953165, at \*3 n. 5 (S.D.N.Y. Dec.12, 2003) ("Under the ADA definition of 'disability,' merely pleading a physical impairment without specifying that it 'substantially limits' a 'major life activity' may be insufficient to state a claim for relief."); *see also Hale v. King,* 642 F.3d 492, 500 (5th Cir.2011) (holding that, "[t]o establish a claim under [42 U.S.C. § 12102(1)(A) ], a plaintiff must allege that he (1) has a[n] ... impairment that (2) substantially limits (3) a major life activity," and dismissing plaintiff's complaint where it failed to allege, *inter alia,* "that his

conditions substantially limited him in his performance of a life activity"); *Cox v. Civista Med. Ctr.,* 16 F. App'x 185, 186 (4th Cir.2001) (affirming district court's dismissal of the plaintiff's complaint because it failed to "demonstrate a disability" under 42 U.S.C. § 12102(1) (A) or (B)); *Ajuluchuku v. Macy's,* No. 12–CV–1855, 2012 WL 5464467, at \*3 (E.D.Cal. Nov.7, 2012) (dismissing plaintiff's amended complaint because it did "not allege facts establishing any of [the] elements [of 42 U.S.C. § 12102(1) ] ); *Detko v. Blimpies Rest.,* 924 F.Supp. 555, 557 (S.D.N.Y.1996) (dismissing plaintiff's complaint for failure to state a claim where the complaint failed to allege that his speech impediment *"substantially"* limits his "speaking" (emphasis in original)). Here, plaintiff's complaint fails to include any allegations that plausibly suggest that the extent of plaintiff's alleged epilepsy or his cardiac condition "limits one or more major life activities." 42 U.S.C. § 12102(1).

Plaintiff's complaint is also devoid of factual allegations that plausibly suggest that his claim can satisfy the second and third elements of the relevant inquiry. Plaintiff has commenced this action against a town justice, in his individual and official capacities, but plaintiff's complaint states no allegations that plausibly suggest that, for example, defendant Camp is being sued in his official capacity as a conduit for suing the town itself, which is undoubtedly a public entity. [7] Moreover, the allegations of plaintiff's complaint fail to allege facts showing that he has been excluded from participation in services, programs or activities of the Pierreport Town Court or otherwise discriminated against on the basis of disability.

[7]    This is not to suggest that allegations to this effect would, in fact, survive initial review pursuant to 28 U.S.C. § 1915(e).

**\*5** For all of these reasons, I recommend that plaintiff's complaint be dismissed.

### C. *Whether to Permit Amendment*

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003

(E.D.N.Y.1995) (permitting leave to replead granted where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy").

In this instance, given that this case is in it's procedural infancy, I am compelled to recommend that plaintiff be given leave to file an amended complaint that cures the deficiencies identified in this report. As a result of the plaintiff's failure to include virtually any allegations in his complaint, I cannot make a finding that his claims appear to be fatal, nor can it be said that amendment of plaintiff's complaint would be a hopeless exercise. Accordingly, I recommend that plaintiff be given leave to file an amended complaint that includes sufficient factual allegations to permit the court to ascertain whether a plausible ADA claim has been asserted against the named-defendant in that amended pleading. To the extent any amended complaint again asserts a claim against defendant Camp in his official capacity, any amended complaint should demonstrate how he is an appropriate defendant in that capacity. However, I recommend against granting plaintiff leave to file an amended complaint that asserts a claim against defendant Camp in his individual capacity, since it is clearly established law that individual liability is not actionable under the ADA.

In the event plaintiff chooses to file an amended complaint, he is advised that the law in this circuit clearly provides that " 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, J.) (quoting *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987)); *Pourzandvakil v. Humphry,* No. 94–CV–1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J .). Therefore, in his amended complaint, plaintiff must clearly set forth the facts that give rise to the claim, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should specifically allege facts demonstrating the specific involvement of each of

the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). Finally, plaintiff is informed that any such amended complaint will replace the existing amended complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (internal quotation marks omitted)).

### III. *SUMMARY AND CONCLUSION*

**\*6** Plaintiff's complaint in this action, filed against a sitting town justice, is insufficiently stated to permit the court to conclude that he has stated a plausible ADA claim against that defendant in his individual or official capacities. It is there hereby

RECOMMENDED that plaintiff's complaint be DISMISSED, without leave to replead his claims against defendant Camp in his individual capacity, but otherwise with leave to replead, pursuant to 28 U.S.C. § 1915(e)(B) (iii).

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 785534

Case 5:16-cv-01393-MAD-TWD    Document 13    Filed 01/31/17    Page 23 of 46
Fermin v. Moriarty, Not Reported in F.Supp.2d (2003)
2003 WL 21787351

2003 WL 21787351
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Juan FERMIN, Plaintiff,

v.

James MORIARTY, Defendant.

No. 96 Civ. 3022(MBM).
|
Aug. 4, 2003.

Client brought diversity action against attorney, who represented him in connection with his sentencing after he was convicted of narcotics offenses, alleging breach of contract, malpractice, fraudulent misrepresentation, breach of fiduciary duty, and violation of his rights under Sixth Amendment. The District Court, Mukasey, J., held that: (1) prisoner failed to show by preponderance of evidence that he intended to remain in Pennsylvania; (2) court did not have federal question jurisdiction over prisoner's lawsuit; and (3) sufficient transactional relationship did not exist between federal criminal proceeding, and civil lawsuit brought by prisoner, to support discretionary exercise of supplementary jurisdiction over prisoner's civil lawsuit.

Complaint dismissed with leave to amend.

West Headnotes (8)

[1]    **Federal Courts**
       👉 Particular claims as fictitious or colorable
       **Federal Courts**
       👉 Weight and sufficiency
       Client's claims against attorney, alleging fraud and seeking punitive damages, were sufficient to satisfy amount in controversy requirement under federal diversity jurisdiction statute, since attorney did not show to legal certainty that claim was really for less than jurisdictional amount. 28 U.S.C.A. § 1332.

       Cases that cite this headnote

[2]    **Federal Courts**
       👉 Presumptions and burden of proof
       Although a prisoner is presumed to retain his former domicile, he can attempt to demonstrate that he has established a new domicile in his state of incarceration, for the purpose of application of the diversity jurisdiction statute. 28 U.S.C.A. § 1332.

       10 Cases that cite this headnote

[3]    **Federal Courts**
       👉 Weight and sufficiency
       Prisoner incarcerated in Pennsylvania failed to show by preponderance of evidence that he intended to remain in Pennsylvania, in order for New York court to have diversity jurisdiction over lawsuit against New York attorney; although Pennsylvania was where prisoner received his mail, made his telephone calls, visited with his family, received his medical treatment, and he received educational equivalency certificate from State of Pennsylvania, prisoner was resident of New York when he was convicted and prisoner did not otherwise establish that Pennsylvania was his domicile rather than merely his residence. 28 U.S.C.A. § 1332; Fed.R.Civ.P. 12(b)(1), 28 U.S.C.A.

       9 Cases that cite this headnote

[4]    **Federal Courts**
       👉 Imprisonment and incidents thereof
       District court did not have federal question jurisdiction over prisoner's lawsuit against attorney alleging violation of his Sixth Amendment rights, although attorney represented prisoner in federal criminal case, since attorney was not state actor. U.S.C.A. Const.Amend. 6; 28 U.S.C. § 1331; 42 U.S.C.A. § 1983.

       1 Cases that cite this headnote

[5]    **Federal Courts**
       👉 Torts in general

**Federal Courts**
- **Contracts**

District court did not have federal question jurisdiction over prisoner's lawsuit against attorney alleging breach of contract and malpractice, although complaint alleged wrongs that occurred during ongoing federal case; attorney's representation of defendant in federal criminal case did not transform his breach of contract and malpractice claims into claims under federal law. 28 U.S.C.A. § 1331.

Cases that cite this headnote

---

**[6]**   **Federal Courts**
- **Ancillary and incidental jurisdiction in general**

District court could, in its discretion, exercise ancillary jurisdiction over prisoner's lawsuit against attorney alleging breach of contract and malpractice, for attorney's representation of prisoner in federal criminal proceeding in same district where civil lawsuit was brought, although supplementary jurisdiction statute did not apply to controversy. 28 U.S.C.A. § 1367(a).

1 Cases that cite this headnote

---

**[7]**   **Federal Courts**
- **Ancillary and incidental jurisdiction in general**

Ancillary jurisdiction may be exercised over a fee dispute arising out of a criminal case in federal court. 28 U.S.C.A. § 1367(a).

3 Cases that cite this headnote

---

**[8]**   **Federal Courts**
- **Ancillary and incidental jurisdiction in general**

Sufficient transactional relationship did not exist between federal criminal proceeding, and lawsuit brought by prisoner against his attorney alleging fraud, malpractice, and breach of contract in his representation of prisoner, to support discretionary exercise of supplementary jurisdiction over

prisoner's civil lawsuit; although prisoner's criminal case remained before court for purpose of resentencing, prisoner's claims against attorney did not affect resentencing proceeding, judge did not have any special familiarity with subject matter of prisoner's suit, and litigation of case in federal court would have been inconvenient, inter alia, because case involved complex issue of state law.

1 Cases that cite this headnote

---

**Attorneys and Law Firms**

Gregory Antollino, New York, NY, for Plaintiff.

James T. Moriarty, New York, NY, pro se.

OPINION AND ORDER

MUKASEY, J.

**\*1**   Juan Fermin, convicted in this court of narcotics offenses, sues James Moriarty, the attorney who represented him in connection with his sentencing, for breach of contract, malpractice, fraudulent misrepresentation, and breach of fiduciary duty, and for violating his rights under the Sixth Amendment. Moriarty moves to dismiss the complaint for lack of subject matter jurisdiction. In the alternative, Moriarty moves for summary judgment dismissing Fermin's claims. For the reasons set forth below, the complaint is dismissed with leave to amend.

I.

The facts alleged in the complaint are as follows: Juan Fermin is incarcerated in Allenwood, Pennsylvania. James Moriarty is an attorney licensed to practice law in the State of New York and, at the time of the events at issue, was a member of the bar of this court. (Compl.¶¶ 3–4)

On June 22, 1992, Moriarty and Fermin entered into a contract. (*Id.* ¶ 6) The contract, which was signed by Moriarty and Fermin's stepfather Juan Guzman,

described itself as "a draft of a retainer agreement between James Moriarty and Juan Guzman on behalf of Juan Fermin" that would be "more formally drafted" within ten days. (*Id.* Ex. 1) Under the terms of the contract, Moriarty promised to "represent Juan Fermin with regard [sic] his sentencing before the United States District Court" and "in the United States Circuit Court for the Second Circuit with regard the appeal of his coinviction [sic] on the above indictment." (*Id.*) Fermin, in turn, agreed to pay Moriarty "at least $20,000 and up to $25,000" for his services, "depending on the total amount of work involved as well as the expenses of printing the appellate brief and appendix." (*Id.*)

Over several months, Fermin paid Moriarty a total of $25,000. (*Id.* ¶¶ 8–14) However, Moriarty refused to perfect Fermin's direct appeal, forcing Fermin to retain substitute counsel at an additional cost of $35,000. (*Id.* ¶¶ 15–16) In order to procure the $35,000, Fermin had to sell real property that he otherwise would have continued to manage. (*Id.* ¶ 17) Despite repeated requests, Moriarty has refused to return the unused portion of the $25,000 or even to respond to Fermin's letters or telephone calls. (*Id.* ¶¶ 17–19)

## II.

The complaint is not a model of clarity. In the "facts" section of the complaint, Fermin places his specific allegations under two headings: breach of contract and legal malpractice. Then, in the "claims for relief" section of the complaint, Fermin adds three additional claims, namely (i) that Fermin "violated his fiduciary duty as plaintiff's agent"; (ii) that Fermin "created a tort of misrepresentation"; and (iii) that Fermin "violated Plaintiff's Sixth Amendment guarantee of effective assistance of counsel as this right is interpreted by the laws of the United States." (Compl.¶¶ 37–38) Construing the complaint liberally, as I must when the plaintiff appears *pro se,*[1] *see Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), Fermin thus brings five claims against Moriarty: breach of contract, malpractice, fraudulent misrepresentation, breach of fiduciary duty, and violation of the Sixth Amendment.

[1]     When he filed his complaint, Fermin was not yet represented by counsel.

**\*2** Fermin seeks several remedies. First, Fermin seeks a declaration that Moriarty's conduct amounts to breach of contract, legal malpractice, misrepresentation, a violation of the Code of Professional Responsibility, and a Sixth Amendment violation. Second, Fermin requests $60,000 in compensatory damages and $40,000 in punitive damages. Finally, Fermin asks the court to discipline Moriarty.

## III.

**[1]**    Moriarty moves to dismiss Fermin's complaint for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1). At the time this action commenced, the United States Code conferred jurisdiction upon district courts if a suit was between citizens of different states and the matter in controversy exceeded $50,000. *See* 28 U.S.C. § 1332(a) (1996). Moriarty claims first, without citing any evidence in the record or case law, that there is no diversity of citizenship in this case because both parties are domiciled in New York. (*See* Moriarty's Mem. of L. at 1) Despite Moriarty's cursory treatment of the issue, I agree with him. Although the complaint adequately alleges that the amount in controversy is sufficient to confer jurisdiction on this court,[2] it does not adequately allege diversity of citizenship.

[2]     Moriarty makes a far more extensive argument regarding the amount in controversy than he does regarding diversity. Specifically, Moriarty argues that because Fermin has not stated a cognizable malpractice claim or a cognizable claim for punitive damages, the amount in controversy does not exceed $50,000. That argument is based on a fundamental misconception about when and how the amount in controversy is determined. Contrary to Moriarty's view, "[t]he amount in controversy is determined at the time the action is commenced." *Tongkook Am., Inc. v. Shipton Sportswear Co. .,* 14 F.3d 781, 784 (2d Cir.1994). Moreover, "[i]t is well settled that 'the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." ' *Chase Manhattan Bank, N.A. v. Am. Nat. Bank and Trust Co. of Chicago,* 93 F.3d 1064, 1070 (2d Cir.1996) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 288–89, 58 S.Ct. 586, 82 L.Ed. 845 (1938)). Finally, "if punitive damages are permitted

under the controlling law, the demand for such damages may be included in determining whether the jurisdictional amount is satisfied." *A.F.A. Tours, Inc. v. Whitchurch,* 937 F.2d 82, 87 (2d Cir.1991). Here, Fermin has alleged fraud against Moriarty, and conceivably could be entitled to punitive damages if he proved that claim. That the fraud claim or another claim might not survive a motion to dismiss or a motion for summary judgment is irrelevant, because "[l]egal certainty is analyzed by what appears on the face of the complaint; subsequent events—such as a valid defense offered by the defendant ..., 'do ... not show [plaintiff's] bad faith or oust the jurisdiction." ' *Wolde–Meskel v. Vocational Instruction Project Cmty. Servs., Inc.,* 166 F.3d 59, 63 (2d Cir.1999) (quoting *St. Paul,* 303 U.S. at 289). The Second Circuit "recognizes a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy." *Id.* Moriarty has done nothing to overcome that presumption.

For the purpose of § 1332(a), an individual's citizenship is determined by domicile. *Williamson v. Osenton,* 232 U.S. 619, 624–25, 34 S.Ct. 442, 58 L.Ed. 758 (1914). A party's domicile is established at the time a case is filed, *Freeport–McMoRan v. KN Energy, Inc.,* 498 U.S. 426, 428–29, 111 S.Ct. 858, 112 L.Ed.2d 951 (1991), and it is determined by the party's place of residence and his intent to remain in that place indefinitely, *Miss. Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 48, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989).

**[2]**    It is well-established that a prisoner does not acquire a new domicile when he is incarcerated in a state different from his previous domicile. Instead, the prisoner retains his preincarceration domicile. *See* 15 James Wm. Moore et al., *Moore's Federal Practice* ¶ 102.37[8][a] (3d ed.1999) (collecting cases). In some jurisdictions, the rule that prisoners retain their former domicile has taken the form of an irrebuttable presumption. *See id.* ¶ 102.37 [8][b]. However, in the Second Circuit, along with three other circuits, the presumption is rebuttable; thus, although a prisoner is presumed to retain his former domicile, he can attempt to demonstrate that he has established a new domicile in his state of incarceration. *See Housand v. Heiman,* 594 F.2d 923, 925 n. 5 (2d Cir.1979) (embracing the "more recent trend ... in the direction of allowing a prisoner to try to show that he has satisfied the prerequisites for establishing domicile in his place of incarceration"); *see also Sullivan v. Freeman,* 944 F.2d 334, 337 (7th Cir.1991) (Posner, J.) ("The presumption

is rebuttable—a prisoner might for example decide he wanted to live in another state when he was released and the federal prison authorities might therefore assign him to a prison in that state, and that would be the state of his domicile."); *Jones v. Hadican,* 552 F.2d 249, 251 (8th Cir.1977) ("While retaining the usually valid presumption that a prisoner retains his pre-incarceration domicile, [the rebuttable presumption rule] is sufficiently flexible to allow a prisoner to show truly exceptional circumstances which would justify a finding that he has acquired a new domicile at the place of his incarceration."); *Stifel v. Hopkins,* 477 F.2d 1116, 1126 (6th Cir.1973) ("We recognize the importance of considering physical or legal compulsion in determining whether domicile is gained or lost, but we limit the application of involuntary presence to its operation as a presumption ordinarily requiring more than unsubstantiated declarations to rebut.").

**\*3**    On its face, Fermin's complaint does not adequately allege diversity of citizenship. In order for a prisoner to establish diversity jurisdiction based on the theory that his place of incarceration is his domicile, "the complaint must allege facts sufficient to raise a substantial question about the prisoner's intention to acquire a new domicile." *Jones,* 552 F.2d at 251. Like the plaintiff in *Housand,* who was also suing his former attorney for malpractice, Fermin "does not make clear in his pleadings on what facts his diversity claim is based." *Housand,* 594 F.2d at 925. Although he lists 28 U.S.C. § 1332 as a basis for federal jurisdiction, Fermin alleges only that he is confined in Pennsylvania. In the absence of additional facts demonstrating an intent to remain in Pennsylvania indefinitely, that fact alone does not confer jurisdiction on this court.

**[3]**    Even if the complaint were not facially inadequate, Fermin's claims would still have to be dismissed under Fed.R.Civ.P. 12(b)(1), because Fermin has not shown by a preponderance of the evidence that he intends to remain in Pennsylvania. "Once a plaintiff's allegations of diversity are challenged by a defendant, plaintiff must prove by a preponderance of the evidence that diversity in fact exists." *Bevilaqua v. Bernstein,* 642 F.Supp. 1072, 1073 (S.D.N.Y.1986) (Weinfeld, J.). Here, plaintiff has not met that burden. In his Reply, Fermin declares that he lives in Pennsylvania; that he receives his mail in Pennsylvania; that he makes his telephone calls from Pennsylvania; that Pennsylvania is where he sees his family; that he receives medical treatment in Pennsylvania; and that he

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

received an educational equivalency certificate from the State of Pennsylvania. (*See* Reply at 5) However, these facts establish only that, at the time Fermin filed his complaint, he was incarcerated in Pennsylvania. Fermin has not established that Pennsylvania is his domicile rather than merely his residence.

## IV.

**[4]** The complaint alleges the presence of a federal question as an alternative basis for subject matter jurisdiction over this case. (*See* Compl. ¶ 1) Section 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (2000). Fermin offers two separate theories to support federal question jurisdiction. First, in his complaint, Fermin asserts that this court has jurisdiction over his claims as a result of his "civil rights claim" against Moriarty. (*Id.*) Second, in his Reply, Fermin claims that although the breach of contract and malpractice claims arise out of state law, those claims will be evaluated under federal law, because Moriarty represented Fermin in a federal criminal case. Neither theory supports federal question jurisdiction here.

### A. Sixth Amendment Claim

First, Fermin's Sixth Amendment claim does not confer federal jurisdiction over this action, because the claim cannot rest upon 42 U.S.C. § 1983. Section 1983 permits any person to recover damages or other relief from another who has deprived him of his constitutional rights "under color of any statute, ordinance, regulation, custom, or usage of any State or Territory." 42 U.S.C. § 1983 (2000). Moriarty, a private attorney, cannot be regarded as a state actor for the purposes of § 1983. *See Housand,* 594 F.2d at 924–925 (concluding that even "public defenders or court-appointed defense attorneys do not act 'under color of law' "). [3] Because Fermin has no cognizable Sixth Amendment claim against his private attorney, that claim cannot serve as the basis for federal jurisdiction over this case. *See id.* at 925 (affirming dismissal of complaint where plaintiff had no cognizable § 1983 claim against his attorney); *Seedman v. Stanley Roy Root & Assocs.,* No. 99 Civ. 4234, 2000 WL 290345, at *2 (S.D.N.Y. Mar.20, 2000) (federal question jurisdiction lacking over action against private attorney); *D'Ottavio*

*v. Depetris,* No. 91 Civ. 6133, 1991 WL 206278, at *1 (S.D.N.Y. Sept.26, 1991) (same).

3    Moriarty also cannot be considered a state actor under *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), which permits suits against federal officers. *See Housand,* 594 F.2d at 924 n. 1 (noting that "a *Bivens*-type suit requires federal action in the same manner as § 1983 requires state action").

### B. Federal Law

**\*4** **[5]** Furthermore, that Moriarty represented Fermin in a federal criminal case does not transform his breach of contract and malpractice claims against Moriarty into claims that satisfy the requirements of § 1331. "Federal question jurisdiction exists where a well-pleaded complaint 'establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.' " *Greenberg v. Bear, Stearns & Co.,* 220 F.3d 22, 25 (2d Cir.2000) (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 27–28, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)). Thus, "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *See Merrell Dow Pharmaceuticals, Inc. v. Thompson,* 478 U.S. 804, 813, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986). Rather, a district court must "look to the nature of the federal question raised in the claim to see if it is sufficiently substantial to warrant federal jurisdiction." *Greenblatt v. Delta Plumbing & Heating Corp.,* 68 F.3d 561, 570 (2d Cir.1995).

The Supreme Court's decision in *Merrell Dow* indicates that a federal question is substantial enough to warrant federal jurisdiction only when a federal law that creates a cause of action is an essential component of the plaintiff's state law claim. *See* Erwin Chemerinsky, *Federal Jurisdiction* 281 (3d ed.1999) (describing *Merrell Dow*'s holding). In *Merrell Dow,* the plaintiffs asserted a negligence claim which included, as an element, a rebuttable presumption of negligence created by the defendants' alleged misbranding of drugs in violation of the Federal Food, Drug, and Cosmetic Act ("FDCA"). *See Merrell Dow,* 478 U.S. at 805–06. However, because neither the FDCA nor any other federal law provided a cause of action for misbranding, *see id.* at 810–11, the Court concluded that federal question jurisdiction

over the plaintiff's negligence claim was lacking. *See Merrell Dow*, 478 U.S. at 814 (deferring to Congress's own determination that "the presence of a claimed violation of [the FDCA] as an element of a state cause of action is insufficiently 'substantial' to confer federal-question jurisdiction").

Here, the complaint does not allege that a federal law that creates a cause of action is an essential component of either the malpractice claim or the breach of contract claim. Indeed, the complaint does not raise any federal issue at all. The most that can be said about the complaint is that it alleges wrongs that occurred during an ongoing federal case.

V.

**[6]**    Fermin argues in his Memorandum in Opposition that even if diversity jurisdiction is lacking,[4] the court should, in its discretion, exercise ancillary jurisdiction over this case. As a threshold matter, it is unclear if, or to what extent, criminal ancillary jurisdiction survived the enactment of 28 U.S.C. § 1367(a). That statute states that "in any civil action over which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a) (2000); *see also* 16 James Wm. Moore et al., *Moore's Federal Practice* ¶ 106.03[1] (3d ed. 1999) ("Supplemental jurisdiction is a statutory term that is generally viewed by the courts and commentators as encompassing both what courts previously referred to as 'pendent' jurisdiction and 'ancillary' jurisdiction."). By its own terms, the statute applies to civil cases only. Here, the underlying action was a criminal case; therefore, the statute does not apply.

---

[4]    Notably, Fermin no longer claims that federal question jurisdiction exists.

**\*5**    Notwithstanding the language of 28 U.S.C. § 1367(a), one court in this district has concluded that ancillary jurisdiction still may be exercised over disputes related to criminal cases. In *United States v. Weissman*, No. S2 94 CR. 760, 1997 WL 334966 (S.D.N.Y. Jun.16, 1997), a jury convicted Jerry Weissman on two counts of perjury and one count of obstruction of justice. After

the verdict but before post-trial motions and sentencing, Weissman's former employer, Empire Blue Cross/Blue Shield ("Empire"), informed Weissman that it would not advance funds to cover either future legal costs or recently incurred costs. *Id.* at *1, 7. Weissman moved to compel Empire to continue to advance the funds necessary for his defense and to pay the legal bills he had already submitted. The Court exercised jurisdiction over the application, and rejected Empire's argument that Congress "did away with ancillary jurisdiction in criminal proceedings." *Id.* at *4. Judge Haight noted that "ancillary jurisdiction in criminal proceedings never derived from any particular statutory authority," *id.,* and then "look[ed] to analogous situations in the civil context to determine if the exercise of ancillary jurisdiction [was] proper," *id.* Based on civil cases holding that district courts may exercise ancillary jurisdiction over fee disputes between a party and his counsel, *e.g., Grimes v. Chrysler Motors Corp.,* 565 F.2d 841 (2d Cir.1977), the Court concluded that it had jurisdiction over Weissman's claim.

No other courts in this district have addressed the issue squarely, but a court in another district has criticized and departed from *Weissman.* In *United States v. Polishan,* 19 F.Supp.2d 327 (M.D.Pa.1998), a criminal defendant moved to compel his former employer and its insurer to pay defense costs. The Court held that it did not have ancillary jurisdiction over the action. According to the Court, unlike a fee dispute between a party and his lawyer, where the parties to the dispute have already submitted themselves to the jurisdiction of the court, and unlike a case where contested property is in the court's control, the defendant's motion did not arise out of the same nucleus of operative fact as the criminal action. *See id.* at 332 ("Although Polishan's conduct while Leslie Fay's chief financial officer is related to these claims in a peripheral manner, it cannot be reasonably maintained that his motion arises out of the same nucleus of operative facts underlying the prosecution.").

According to the *Polishan* Court, "the major flaw in *Weissman* is the court's failure to address the constitutional limitations of ancillary jurisdiction." *Id.* at 333. The Court explained:

> The threshold inquiry ... must concern consistency with constitutional limits of federal judicial power. This is what the [common nucleus of operative facts]

test seeks to attain. It is not just a matter of fostering judicial economy, minimizing litigants' costs, or protecting court officers. It is, on the contrary, a matter of ensuring that federal judicial power is exercised only in a case or controversy within a federal court's limited subject matter jurisdiction. The existence of a common nucleus of operative facts, court control over property, *or the presence of parties to a fee dispute* are precisely the type of factors that assures that the vague concept of ancillary jurisdiction does not overwhelm the boundaries of federal judicial authority.

**\*6** *Id.* (emphasis added).

**[7]** Thus, although the *Polishan* Court repudiated *Weissman* insofar as it refused to adjudicate a criminal defendant's suit against a third-party insurer, the Court agreed with *Weissman* that a federal court may exercise criminal ancillary jurisdiction over a fee dispute. Without delineating the precise boundary of criminal ancillary jurisdiction, I too conclude that ancillary jurisdiction may be exercised over a fee dispute arising out of a criminal case. As a threshold matter, I refuse to read 28 U.S.C. § 1367 to abolish criminal ancillary jurisdiction. First, as Judge Haight noted, the Second Circuit has acknowledged the existence of criminal ancillary jurisdiction since Congress passed the Judicial Improvement Act of 1990, now codified in 28 U.S.C. § 1367. *See Rufu v. United States,* 20 F.3d 63, 65 (2d Cir.1994); *Soviero v. United States,* 967 F.2d 791, 792 (2d Cir.1992); *Mora v. United States,* 955 F.2d 156, 158 (2d Cir.1992).[5] Second, as Judge Haight noted also, Congress passed the current version of 28 U.S.C. § 1367 in order to overrule *Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), which limited the exercise of pendent-party jurisdiction. *See Weissman,* 1997 WL 334966, at *4 (collecting cases and examining legislative history). There is no reason to conclude that, in restoring the pre-*Finley* status quo, Congress intended to abrogate a separate, longstanding basis for federal jurisdiction.

[5] The criminal cases in which the Second Circuit has affirmed the exercise of ancillary jurisdiction involved the return of property seized from criminal defendants; thus, the subsidiary controversies in those cases "ha[d] direct relation to property or assets actually or constructively drawn into the court's possession or control by the principal suit." *Fulton Nat'l Bank of Atlanta v. Hozier,* 267 U.S. 276, 280, 45 S.Ct. 261, 69 L.Ed. 609 (1925). However, the Supreme Court has indicated that ancillary jurisdiction extends beyond cases in which the court controls the funds at issue. *See Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 379, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) (characterizing the language in *Fulton Nat'l Bank* as an "excessively limited description of the doctrine" of ancillary jurisdiction).

Once it is established that a district court may exercise ancillary jurisdiction in criminal cases, the question presented is simply whether there is a sufficient transactional relationship between a primary and a subsidiary controversy to support the exercise of supplementary jurisdiction over the latter. With respect to fee disputes between a party and his attorney, the Second Circuit has already answered that question in the affirmative. *See Cluett, Peabody & Co. v. CPC Acquisition Co.,* 863 F.2d 251, 256 (2d Cir.1988) (" 'It is well settled that [a] federal court may, in its discretion, exercise ancillary jurisdiction to hear fee disputes ... between litigants and their attorneys when the dispute relates to the main action ....' " (quoting *Petition of Rosenman Colin Freund Lewis & Cohen,* 600 F.Supp. 527, 531 (S.D.N.Y.1984))). Like the plaintiff in *Cluett,* plaintiff in this case claims that his former attorney defrauded him and that he has been charged excessively for the services rendered by the attorney.[6] Thus, as in *Cluett,* it is within this court's discretion to exercise ancillary jurisdiction over the subsidiary dispute between Fermin and his former attorney.

[6] Notably, in his response to Moriarty's motion to dismiss, Fermin concedes that "this is strictly a breach of contract and misrepresentation case." (Mem. in Opp. at 8)

## VI.

**[8]** Although I could exercise ancillary jurisdiction over this action, I decline to do so. In *Cluett,* the Second Circuit identified four factors to be considered

in deciding whether to exercise ancillary jurisdiction over a fee dispute: (1) the trial court's familiarity with the subject matter of the suit and the work performed by the law firm in connection with the lawsuit; (2) the Court's responsibility to protect its own officers in such matters as fee disputes; (3) the convenience of litigating in federal court as opposed to state court; and (4) considerations of judicial economy. *Id.* Additionally, courts have emphasized that, before exercising ancillary jurisdiction, "[m]ost important, [a court] must determine whether the exercise of jurisdiction is necessary to provide a fair resolution of the underlying matter, and to allow the court to administer its proceedings." *Weissman,* 1997 WL 334966, at *6; *see also Kalyawongsa v. Moffett,* 105 F.3d 283, 287 (6th Cir.1997) (noting that resolution of fee disputes is "often required to provide a full and fair resolution of the litigation").

**\*7** Here, the subsidiary dispute between Fermin and Moriarty does not bear on the underlying criminal case against Fermin in the same way that the fee dispute in *Weissman* bore on the case against Weissman. In *Weissman,* the Court concluded that the fee dispute between Weissman and his attorneys was "intimately intertwined with the comportment of the [criminal] case" because the dispute threatened to affect the timing of post-trial motions and sentencing. *Weissman,* 1997 WL 334966, at *7. Here, on the other hand, although Fermin's criminal case remains before this court for the purpose of resentencing, Fermin's claims against Moriarty will in no way affect the resentencing proceeding.

Further, this court has no special familiarity with the subject matter of Fermin's suit. I did not preside over Fermin's trial, nor did I conduct the sentencing hearing at which Moriarty represented Fermin. *See Riva Techs. v. Zack Elecs., Inc.,* 2002 WL 1559584, at *7 (N.D. Ill., Jul 15, 2002) (declining to exercise ancillary jurisdiction when "what few court proceedings took place in the case were conducted by the district judge then presiding in the case, and occurred long before the parties first appeared before this Court").

Finally, litigating the case in federal court would be inconvenient, *inter alia,* because the case involves a complex issue of state law. A review of the complaint for factual allegations that would support a claim for fraudulent misrepresentation shows that Fermin has alleged only that Moriarty entered into a contract with the

undisclosed intent to breach that contract. (*See* Compl. ¶ 30 (alleging that Moriarty "never intended to execute his appellate responsibility"); *see also* Mem. in Opp. at 3 (defending plea for punitive damages on the ground that "Moriarty entered into the contract knowing he would not undertake an appeal"))

Under New York law as interpreted by the Second Circuit, Fermin's allegation is insufficient to support a fraud claim. The Circuit has repeatedly held that, as a general rule, the allegation that a party entered into a contract intending to breach that contract is insufficient to support a claim for fraud under New York law. *See Manning v. Utils. Mut. Ins. Co.,* 254 F.3d 387, 401 (2d Cir.2001); *Bridgestone/Firestone, Inc., v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 19–20 (2d Cir.1996). Nevertheless, there is substantial confusion in the New York case law regarding the rule adhered to in *Manning* and *Bridgestone Firestone.* One district court explained: "The rule derives from a very long and very puzzling line of New York cases. On at least four occasions, New York's Court of Appeals has expressly held that 'a contractual promise made with the undisclosed intention not to perform it constitutes fraud.' At the same time, however, there are numerous Appellate Division cases that state precisely the opposite rule." *Cougar Audio, Inc. v. Reich,* No. 99 Civ. 4498, 2000 WL 420546, at *6 n. 4 (S.D.N.Y. Apr.18, 2000) (citation omitted); *see also Marriott Intern., Inc. v. Downtown Athletic Club of New York City, Inc.,* No. 02 Civ. 3906, 2003 WL 21314056, at *6–7 (S.D.N.Y. Jun.09, 2003) (discussing the New York case law in detail). Were I compelled to do so, I would, of course, adhere to the Second Circuit's interpretation of New York law; however, the better approach in this case is to allow a state court to adjudicate Fermin's claims.[7]

[7]    Although this court acknowledges its responsibility to protect its officers in fee disputes, Moriarty does not seek the protection of the court. In any event, the other factors control.

## VII.

**\*8** Because the complaint is dismissed for lack of subject-matter jurisdiction, I need not address Moriarty's motion for summary judgment. For future reference, the parties are reminded that Local Rule 56.1 requires the party moving for summary judgment to file a statement setting

2003 WL 21787351

forth the material facts that are allegedly undisputed, S.D.N.Y. & E.D.N.Y. R. 56.1(a), and the non-moving party to file a statement setting forth the material facts that it contends are in dispute, *id.* 56.1(b). Both parties to this case failed to comply with Local Rule 56.1.

Consistent with *Housand* and other cases in which prisoners have failed adequately to allege diversity jurisdiction, I dismiss Fermin's complaint with leave to amend. *See, e.g., Housand,* 594 F.2d at 926 (remanding the case "with instructions to allow amendment of the complaint within a reasonable time to state a claim, if any exists, under diversity jurisdiction"). Plaintiff may file an amended complaint alleging diversity of citizenship within forty-five (45) days of the date of this order. In considering whether to file an amended complaint, and what to include in that complaint should he file one, plaintiff should bear in mind that a prisoner must offer more than "unsubstantiated declarations" to rebut the presumption that he retains his pre-incarceration domicile. *Stifel,* 477 F.2d at 1126.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 21787351

---

**End of Document**    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Disagreed With by Pollard v. United States Parole Commission, S.D.N.Y., June 6, 2016

2002 WL 31886175
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Carrie Chandler PENA, Plaintiff,
v.
Brion D. TRAVIS, Elwood Fisher, Rochelle
Ormon, Raymond Diaz, Roslyn Ligon,
S.P.O. Palumbo, James Kelly, John Johnson
and Commissioner Platt, Defendants.

No. 01 Civ.8534 SAS.
|
Dec. 27, 2002.

Parolee brought civil rights suit alleging various violations of her constitutional rights while on parole. Defendant parole officers moved to dismiss for lack of subject matter jurisdiction and for failure to state claim. The District Court, Scheindlin, J., held that: (1) claims concerning issues that had been raised before in previous civil rights suits were barred under doctrines of claim or issue preclusion; (2) claims arising from imposition of curfew and drug testing accrued when those special conditions of parole were imposed and were time barred; (3) parolee had no constitutionally protected interest in receiving early discharge from parole or being free of special conditions of parole; and (4) allegedly improper disclosure of parolee's medical records to U.S. Probation Department stated claim for deprivation of privacy rights.

Motions granted in part and denied in part.

West Headnotes (18)

**[1]** **Judgment**
⚖ What constitutes identical causes

Res judicata barred civil rights claims against parole officers attacking imposition of curfews on parolee on due process grounds, where curfews were attacked in earlier civil rights suit brought against same officers.

Cases that cite this headnote

**[2]** **Judgment**
⚖ Persons not parties or privies

Non-mutual defensive issue preclusion barred assertion of due process claims against parole officers arising out of imposition of curfews on parolee, where imposition of same curfews had been upheld in earlier actions against other parole officers.

1 Cases that cite this headnote

**[3]** **Judgment**
⚖ What constitutes identical causes

Res judicata shielded parole officer from further suit on claims of unreasonable drug testing which were rejected in earlier civil rights suit brought by parolee.

Cases that cite this headnote

**[4]** **Judgment**
⚖ Persons not parties or privies

Non-mutual collateral estoppel barred parolee from relitigating claims of unreasonable drug testing against different parole officers who were joined as additional defendants in new claim.

Cases that cite this headnote

**[5]** **Limitation of Actions**
⚖ Liabilities Created by Statute

Civil rights claims involving discrete incidents, rather than ongoing patterns or practices, could not be saved from limitations bar under continuing violation doctrine. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[6]** **Limitation of Actions**
⚖ Civil rights

Civil rights claim alleging improper documentation in parole file was time-barred

Case 5:16-cv-01393-MAD-TWD    Document 13    Filed 01/31/17    Page 33 of 46

when parolee knew of parole officer's alleged improper record-keeping for more than three years before filing suit. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[7]    Limitation of Actions**
    Liabilities Created by Statute

Civil rights claims arising out of allegedly improper imposition of curfew on parolee accrued when curfew was imposed. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[8]    Limitation of Actions**
    Civil rights

Accrual of civil rights claims when parole officers imposed allegedly improper curfew on parolee was not tolled by fact that parolee did not know of officers' attribution to parolee of certain prostitution convictions that allegedly belonged to another person; reason why curfew was imposed was peripheral to true claim for loss of liberty caused by curfew. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[9]    Limitation of Actions**
    Civil rights

Civil rights claims against supervising parole officer arising from imposition of curfew accrued when parolee obtained knowledge of officer's supervisory role over decision, and thus were time-barred when brought more than three years thereafter. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[10]    Limitation of Actions**
    Liabilities Created by Statute

**Limitation of Actions**
    Civil rights

Civil rights claims arising from drug testing of parolee accrued when she was subjected

to drug testing, not when she learned that rap sheet, which was allegedly erroneously attributed to her, formed basis for testing. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[11]    Pardon and Parole**
    Discharge from parole

Parolee had no constitutionally protected liberty interest in receiving early discharge from parole; New York statute authorizing early release left decision to discretion of state parole board. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

**[12]    Constitutional Law**
    Freedom of Travel and Movement

**Constitutional Law**
    Freedom of Association

**Pardon and Parole**
    Parole Conditions;Validity

Parolee's First Amendment rights to freedom of travel and association could be abridged by parole restrictions without implicating a constitutional violation. U.S.C.A.Const.Amend. 1; 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[13]    Sentencing and Punishment**
    Parole

Denial of early release from parole did not fall within the purview of the Eighth Amendment's prohibition against cruel and unusual punishment. U.S.C.A.Const.Amend. 1; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[14]    Judgment**
    What constitutes distinct causes of action

Parolee's prior civil rights claims arising out of parole officers' allegedly erroneous use of

rap sheets in imposition special conditions upon parole did not present res judicata bar to claim that officers' systematic concealment of third-party rap sheets was arbitrary and capricious, as later claim required affirmative act by parole officers, which was not raised or litigated in prior actions. 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

[15] **Limitation of Actions**
      👉 **Civil rights**

Civil rights claim that parole officers' systemic concealment of their use of third-party rap sheets in parolee's file was arbitrary and capricious did not accrue until parolee became aware that rap sheets were in her parole file. 42 U.S.C.A. § 1983.

Cases that cite this headnote

[16] **Constitutional Law**
      👉 **Parole**

**Pardon and Parole**
      👉 **Parole Conditions;Validity**

Parolee did not have protected liberty interest in being free from special conditions of parole that were left to discretion of parole board under New York law, and thus fact that allegedly erroneous inclusion of rap sheets in parolee's file may have led to special conditions of curfew and drug testing did not state civil rights claim for deprivation of due process. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

16 Cases that cite this headnote

[17] **Constitutional Law**
      👉 **Parole**

**Pardon and Parole**
      👉 **Liabilities**

Parolee did not state civil rights claim for violation of due process against parole officer based on his alleged knowing inclusion of false information in her parole file, absent any showing that inclusion violated protected

liberty interest. U.S.C.A.Const.Amend. 14; 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

[18] **Constitutional Law**
      👉 **Parole**

**Pardon and Parole**
      👉 **Parole Boards or Officers**

Disclosure of state parolee's medical records to United States Probation Department was presumptively invalid, such that parolee had claim for violation of her Fourteenth Amendment privacy rights, where federal agency was not among entities to which disclosure was authorized by New York law. U.S.C.A.Const.Amend. 14; 42 U.S.C.A. § 1983; McKinney's Executive Law § 259-a.

1 Cases that cite this headnote

**Attorneys and Law Firms**

Carrie Chandler Pena, New York, New York, Plaintiff pro se.

Lisa E. Fleischmann, Assistant Attorney General, New York, New York, for Defendants.

*OPINION AND ORDER*

SCHEINDLIN, J.

**\*1** Carrie Chandler Pena, proceeding pro se, brings this action pursuant to section 1983 of Title 42 of the United States Code ("section 1983") to redress alleged violations of her constitutional rights under the First, Fourth, Eighth, Ninth and Fourteenth Amendments. Defendants have moved to dismiss the action for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted. *See* Fed.R.Civ.P. 12(b)(1) and (6). For the reasons stated herein, defendants' motion is granted in part and denied in part.

I. BACKGROUND

2002 WL 31886175

### A. Plaintiff's Allegations

Plaintiff alleges various violations of her constitutional rights arising from defendants' supervision of her while on parole. On March 12, 1981, plaintiff was convicted of attempted murder, conspiracy, assault and criminal possession of a weapon and was sentenced to a five to fifteen-year prison term. ¶¶ 134-135. [1] After serving the minimum five year term, plaintiff was released to parole supervision on February 28, 1986. ¶ 136.

[1]     Citations to "¶ ____" are to paragraphs in plaintiff's Second Amended and Supplemented Complaint.

Plaintiff's first complaint involves the inadequacy of notes taken by Parole Officer Raymond Diaz. According to plaintiff, Officer Diaz failed to maintain accurate and complete Chronological Entries ("Chron Notes"), which are written records containing information pertaining to and/or received from parolees. ¶¶ 33-104. In general, plaintiff claims that Officer Diaz failed to record: (1) her address or telephone number; (2) no negative police contact; (3) no use of drugs; and (4) steady employment substantiated with earnings statements. ¶¶ 40-46.

In particular, plaintiff contends that on January 22, 1997, she informed Officer Diaz that she had worked at a law firm under the name of Amy Cabral and that she would provide him with an earnings statement on her next report date. ¶¶ 47-49. The Diaz Chron Notes reflect that plaintiff's employment was "unverified" and that she had a "grandiose demeanor." ¶¶ 51-53. When she subsequently reported to Officer Diaz on February 19, 1997, she admitted she no longer worked at the law firm but gave him three pay statements verifying her prior employment. ¶ 54. The Diaz Chron notes did not reflect this employment verification and instead labeled plaintiff as "unemployed." ¶¶ 55-56. On March 19, 1997, plaintiff told Officer Diaz that she had obtained employment with two employment agencies, ¶¶ 57, 59, but Officer Diaz did not record this information. ¶ 62. On April 10, 1997, Officer Diaz made an unannounced visit to plaintiff's home at which time she informed him that she would be starting a new assignment with another employment agency. ¶¶ 65, 70. Officer Diaz's Chron Notes describe his attempt to confirm plaintiff's employment as "in vain" and do not include information regarding plaintiff's new employment. ¶¶ 81, 85. On April 16, 1997, plaintiff gave Officer Diaz two earnings statements which are not reflected in his Chron Notes. ¶¶ 86-89. Officer Diaz's May

7, 1997 and June 18, 1997 Chron Notes similarly fail to include information regarding plaintiff's verification of employment. ¶¶ 95, 103.

**\*2** On April 16, 1997, plaintiff was ordered to provide a urine sample for drug testing. ¶ 90. Diaz's Chron Notes do not record the results of that testing. ¶ 91. On June 18, 1997, Officer Diaz again asked plaintiff to provide a urine sample but again the test results were not included in his Chron Notes. ¶¶ 97-99. Plaintiff claims that Officer Diaz's failure to include information in his Chron Notes, including the results of drug testing, violated plaintiff's right to due process of law under the Fourteenth Amendment.

In addition to information omitted from Diaz's Chron Notes, plaintiff claims that her parole file contains "rap sheets" for Alma Pearsall and Gail Wilson, two individuals with different NYSID numbers. ¶ 107. The Wilson rap sheet contains a 1974 arrest for petit larceny which plaintiff disavows. ¶¶ 110-111. The Pearsall rap sheet contains four prostitution convictions dating back from 1969; a 1972 conviction for sexual deviation in a public place; and a 1992 conviction for criminal possession of a controlled substance (marijuana). Plaintiff claims she has never been arrested for prostitution and otherwise denies any involvement in Pearsall's crimes. ¶¶ 114-115. Plaintiff states that she did not provide the Wilson or Pearsall rap sheets to the Parole Division and believes they were provided by her ex-husband, Pearsall's brother, in 1995. ¶¶ 117-119. Plaintiff contends that she did not know that the Wilson and Pearsall rap sheets were included in her file, ¶ 120-121, and that although defendants had actual or constructive knowledge of these rap sheets, they did not inform plaintiff of the rap sheets, nor did they question her as to the offenses contained therein. ¶¶ 124-125. This concealment by defendants allegedly violated plaintiff's right to due process under the Fourteenth Amendment. Plaintiff claims to have learned of the rap sheets on April 21, 2002, when they were produced in connection with an Article 78 proceeding brought in Albany County Court, New York. ¶ 132.

Plaintiff also complains that several of the defendants imposed unreasonable curfews on her. In September 1995, Parole Officer James Kelly began to supervise plaintiff. ¶ 151. Shortly thereafter, as a special condition of parole, he and Supervising Parole Officer Palumbo imposed a curfew requiring plaintiff to be home between 10:00 p.m.

and 7:00 a.m. seven days a week (the "Kelly curfew"). ¶ 166. Plaintiff believes the curfew was imposed not because she had been convicted of a violent crime but because Officer Kelly was under the impression that plaintiff had been convicted of prostitution based on the Pearsall rap sheet. ¶¶ 157-158. The curfew was permanently lifted on September 29, 1996. ¶ 172. Plaintiff claims that the special condition imposing the curfew was not signed by Officer Palumbo, thus violating her rights to procedural due process. ¶¶ 208-209.

On December 4, 1997, plaintiff's parole supervision was transferred from Officer Kelly to Officer Diaz. ¶ 178. On April 16, 1997, Officer Diaz imposed a curfew requiring plaintiff to remain at home from 11:00 p.m. until 7:00 a.m., Monday through Friday (the "Diaz curfew"). ¶¶ 179-180. This curfew remained in effect until plaintiff completed her parole on August 16, 2000. ¶ 190. Plaintiff was not given a reason for the curfew and believes it was imposed because of the prostitution convictions contained in the Pearsall rap sheet. ¶¶ 184-186. Plaintiff contends that the curfew imposed by Officer Diaz was not signed or initialed by Supervising Parole Officer Rochelle Ormon, which again violated her rights to procedural due process. ¶¶ 197-198.

*3 On September 17, 1997, plaintiff met with Officer Elwood Fisher to discuss a previous request made to Brion D. Travis that her parole supervision be transferred from Officer Diaz and that her curfew be lifted. ¶ 212. Officer Fisher denied plaintiff's request. ¶ 215. Plaintiff also claims that Officer Travis authorized the continuing violation of her constitutional rights by not lifting the Diaz curfew or halting further drug testing. ¶¶ 347-350. Travis's refusal to lift the Diaz curfew and halt further drug testing is claimed to have violated plaintiff's First, Fourth, Eighth and Fourteenth Amendment rights.

Plaintiff claims that Officer Travis is liable for the wrongful imposition of the curfews and the inappropriate drug testing for a number of reasons. *First,* plaintiff claims that Officer Travis authorized the curfew without first filing a rule or regulation with New York's Secretary of State stating that the Parole Division is imposing curfews as a condition of parole. ¶ 356. Consequently, plaintiff claims, Officer Travis was without authority to enact the "Curfew Policy." ¶ 358. *Second,* plaintiff claims that Officer Travis had no legislative authority to enact a policy that curfews be imposed upon parolees as a

standard condition. ¶¶ 367-372. According to plaintiff, the New York State Legislature has exclusively empowered the Board of Parole to promulgate standard conditions of parole, and the Board has not held that curfews are a standard condition. ¶¶ 367, 369. *Third,* plaintiff claims that Officer Travis "permits Parolees to be drug tested on a 'random' basis where there is no drug conviction, no authorization from the Board of Parole requiring drug testing as an additional condition of parole, and no articulated probable cause or reasonable suspicion." ¶ 388. Officer Travis allegedly violated plaintiff's constitutional rights under the First, Eighth, Ninth and Fourteenth Amendments by taking these various actions.

Plaintiff next complains that Officer Diaz falsified official state records. Plaintiff claims that a Diaz Chron Note indicates that Officer Diaz received a telephone call on December 7, 1996, from a person named "DePhillips" of the Bureau of Criminal Investigation ("BCI") regarding allegations by plaintiff's ex-husband that plaintiff may have been involved in fraudulent activity. ¶¶ 219-221. According to plaintiff, there is no Detective DePhillips at BCI. ¶ 243. Plaintiff also claims that on March 20, 1997, Officer Diaz faxed documents to Detectives Atero, Lugo and Croce of the NYPD but that the Chron Notes do not indicate what documents were faxed. ¶¶ 236-237. Plaintiff claims that there are no detectives by those names. ¶¶ 244-247. Accordingly, Officer Diaz's alleged falsification of plaintiff's parole records violated her procedural and substantive rights under the Fourteenth Amendment.

Next are plaintiff's allegations of unreasonable drug testing in violation of the Fourth Amendment's prohibition against unreasonable searches and seizures. Although plaintiff claims she was never convicted of a drug offense; ¶ 252, both Officer Diaz and Officer Roslyn Ligon tested her for heroin and cocaine use. ¶¶ 257, 267. These tests occurred on June 18, 1997 and November 12, 1997. *Id.*

*4 Plaintiff also claims she was denied early discharge from parole when she became eligible on December 29, 1997. ¶ 282. Plaintiff concedes that the decision to grant early discharge from parole is discretionary. ¶ 278. At plaintiff's request, Officer Ligon prepared a Discharge Recommendation dated October 1, 1998. ¶¶ 285-285. With regard to employment, Officer Ligon's Discharge Recommendation stated that plaintiff worked

at temporary agencies "on occasion." ¶ 290. The Recommendation then noted that plaintiff was referred twice for mental evaluation but was "adamant about not needing treatment." ¶ 293. In the Summary of Supervision section of the Recommendation, Officer Ligon wrote: "The subject appears to be anti-social and is often confrontational and does not appear to be a good candidate for Early Discharge at this time." ¶ 295.

Shortly thereafter, Officers Ormon and Fisher approved the Discharge Recommendation denying plaintiff early discharge of parole supervision even though plaintiff had no opportunity to contest Officer Ligon's findings. ¶¶ 298-300. In so doing, Officer Fisher stated that plaintiff is "confrontational and uncooperative with mental hygiene." ¶¶ 299. Commissioner Platt denied plaintiff's application for early parole release on the basis of her "[n]egative response to requirements of community supervision as per parole officer statements negates early discharge." ¶ 301. As an alleged consequence, plaintiff remained under parole supervision for 33 additional months. ¶ 301. Denial of early release from parole allegedly violated plaintiff's First, Eighth, Ninth and Fourteenth Amendment rights.

Plaintiff claims that the Discharge Recommendation was false in the following respects: Officer Ligon did not meet with plaintiff at her home, ¶ 306; plaintiff worked more frequently than "on occasion" and earned more than the $150.00 to $225.00 per week, ¶ 308; plaintiff did not refuse to attend mental health treatment, ¶ 318; Officer Ligon failed to disclose that she refused to help plaintiff with her eviction for non-payment of rent, ¶ 320; and Officer Ligon failed to disclose that plaintiff's neighborhood confrontations stemmed from allegations by a neighbor that plaintiff was involved in prostitution. ¶ 325. Plaintiff states that she did not become aware of the circumstances surrounding the denial of her Early Discharge application until July 1999. ¶ 330.

Finally, plaintiff claims that Officer Johnson released her medical information without authority. According to plaintiff, the Parole Division is prohibited by law from disclosing a parolee's medical or psychiatric records. ¶ 380. Despite this prohibition, plaintiff claims that defendant John Johnson provided a copy of a Medical Evaluation prepared by Dr. Robert H. Berger ("Berger Evaluation") to United States Probation Officer Gregory Carter on June 15, 1999. ¶ 381. Because plaintiff did not give

Johnson permission to provide the Berger Evaluation to the United States Probation Department, its disclosure allegedly violated plaintiff's privacy rights under New York law as well as her constitutional rights under the Ninth and Fourteenth Amendments. ¶¶ 384-385.

### B. Plaintiff's Causes of Action

**\*5** On the basis of these allegations, plaintiff has brought seventeen causes of action, numbered one through ten and twelve to eighteen. Plaintiff's first cause of action, for failure to maintain complete and accurate parole records, contains two claims. The first claim is against Officer Diaz for his allegedly incomplete Chron Notes for the period January 22, 1997 through June 18, 1997. ¶¶ 30-104. Plaintiff states that Officer Diaz denied her substantive and procedural due process under the Fourteenth Amendment by failing to maintain complete and accurate parole records. ¶ 128. Plaintiff alleges that she did not become aware of Officer Diaz's inadequate record keeping until July 1999, when she received a portion of her parole file in connection with a modification hearing. ¶ 131. Plaintiff's second claim, against all defendants except Commissioner Platt, is for the wrongful inclusion of the Pearsall and Wilson rap sheets in her parole file. ¶¶ 105-133. In addition to failing to maintain proper parole records, plaintiff alleges that defendants' concealment of the rap sheets from her "was so arbitrary and capricious and an abuse of administrative discretion that it violated [p]laintiff's rights to due process of law under the Fourteenth Amendment." ¶ 127. In a similar vein, plaintiff's seventh cause of action is against Officer Diaz for the alleged falsification of official state records, namely his Chron Notes. The alleged falsification resulted, *inter alia,* from the inclusion of information from an individual known as "DePhillips" from BCI. ¶¶ 216-251. On June 30, 2000, plaintiff learned that there is no Detective DePhillips working at BCI. ¶ 242. Plaintiff claims that Officer Diaz violated her Fourteenth Amendment rights by allegedly falsifying her parole records.

A group of claims relate to the allegedly illegal and unreasonable imposition of curfews. The second cause of action, against Officers Kelly and Palumbo, alleges that the Kelly curfew was imposed because of the erroneous belief that plaintiff was involved with prostitution based on information contained in the Pearsall rap sheet. ¶ 158. The third cause of action, against Officers Diaz and Ormon, similarly alleges that the Diaz curfew was imposed

for the same reason. ¶ 186. The fourth and fifth causes of action claim that the curfews imposed were illegal because they were not signed by a supervising officer. ¶¶ 195-209. The sixth cause of action is against Officer Fisher for his failure to lift the Diaz curfew. ¶¶ 210-215.

Plaintiff states that these curfews violated many of her constitutional rights. Officer Kelly allegedly violated plaintiff's First, Eighth, Ninth and Fourteenth Amendment rights by imposing a curfew; Officers Diaz and Ormon violated her First Amendments right to freely travel and associate and her Eighth, Ninth and Fourteenth Amendment rights by imposing a curfew; Officers Diaz and Ormon's failure to justify the curfew in writing violated her Fourteenth Amendment rights; Officers Kelly and Palumbo's imposition of a curfew without a writing deprived plaintiff of her due process rights and constructively imprisoned her; and Officer Fisher violated plaintiff's First, Ninth and Fourteenth Amendment rights by refusing to revoke the curfew.

*6 In her fourteenth cause of action, plaintiff contends that Officer Travis's refusal to lift the curfew imposed by Officers Diaz and Kelly despite the fact that the curfew conditions had not been filed with the Secretary of State or legislatively enacted violated plaintiff's First, Eighth, Ninth and Fourteenth Amendment rights. ¶¶ 342-350. Furthermore, plaintiff's fifteenth cause of action claims that Officer Travis lacked authority to create a curfew policy in violation of her First, Eighth, Ninth and Fourteenth Amendment rights. ¶¶ 351-364. Plaintiff's sixteenth cause of action alleges that Officer Travis was not authorized to impose curfews as a condition of parole, as the imposition of curfews falls within the province of the New York State Legislature and thus, he violated plaintiff's First, Eighth, Ninth and Fourteenth Amendment rights. ¶¶ 365-377.

Plaintiff's eighth and ninth causes of action are for unreasonable drug testing by Officers Diaz and Ligon. ¶¶ 252-276. Despite not having a drug arrest or conviction, these officers drug tested plaintiff on April 16, June 18 and November 12, 1997. ¶¶ 256-257, 267. Plaintiff claims that such testing, which she suspects was based on the drug conviction contained in the Pearsall rap sheet, violated her Fourth Amendment rights as it was done in the absence of reasonable suspicion. ¶¶ 261-264, 272-275. Plaintiff also complains, in her eighteenth cause of action, that Officer Travis's alleged policy of permitting random drug testing

in the absence of probable cause or other circumstances violated her Fourth and Fourteenth Amendment rights. ¶¶ 387-390.

Plaintiff's tenth cause of action is against Officers Ligon, Ormon and Fisher for their alleged violation of her First, Eighth, Ninth and Fourteenth Amendment rights by making untruthful representations in plaintiff's early discharge application. ¶¶ 277-330. Plaintiff also contends, in her twelfth cause of action, that Officers Ligon, Ormon and Fisher violated her First and Fourteenth Amendment rights because their reliance on plaintiff's opinion that she was "adamant about not needing treatment" and their belief that she is verbally "confrontational" allegedly led to the denial of the early discharge application. ¶¶ 331-335. In her thirteenth cause of action, plaintiff alleges that in denying the early discharge application, Commissioner Platt's reliance on a parole officer's statement that plaintiff had a negative response to requirements of community supervision violated her First and Fourteenth Amendment rights. ¶¶ 336-341.

Finally, plaintiff's seventeenth cause of action relates to the allegedly improper disclosure of medical information. ¶¶ 378-386. Because Officer Johnson gave plaintiff's medical evaluation to the U.S. Probation Department without first seeking plaintiff's permission, plaintiff claims that her Ninth and Fourteenth Amendment rights were violated.

## II. DISCUSSION

### A. Legal Standard

*7 A motion to dismiss should be granted only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." ' *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). At the motion to dismiss stage, the issue " 'is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test." ' *Phelps v. Kapnolas,* 308 F.3d 180 (2d Cir.2002) (quoting *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998)). The task of the court in ruling on a Rule 12(b)(6) motion is " 'merely to assess the legal feasibility of the complaint, not to assay the weight of

the evidence which might be offered in support thereof." ' *Pierce v. Marano,* No. 01 Civ. 3410, 2002 WL 1858772, at \*3 (S.D.N.Y. Aug.13, 2002) (internal quotation marks and citations omitted).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must accept all factual allegations in the complaint as true, and draw all reasonable inferences in plaintiff's favor. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002). Courts may not consider matters outside the pleadings but may consider documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings. *See id .* at 152-53.

Because "most pro se plaintiffs lack familiarity with the formalities of pleading requirements, [courts] must construe pro se complaints liberally, applying a more flexible standard to evaluate their sufficiency." *Lerman v. Board of Elections in the City of New York,* 232 F.3d 135, 140 (2d Cir.2000) (citing *Hughes v. Rowe,* 449 U.S. 5, 9-10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) and *Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). Finally, it is particularly important to read a pro se complaint liberally where, as here, it alleges civil rights violations. *See Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002); *Morales v. Mackalm,* 278 F.3d 126, 130 (2d Cir.2002) (per curiam).

B. *Res Judicata* Bars Plaintiff's First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Fourteenth, Fifteenth, Sixteenth and Eighteenth Causes of Action

The doctrine of *res judicata* consists of two distinct preclusion concepts: "issue preclusion" and "claim preclusion." *See Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984).

> Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided. This effect also is referred to as direct or collateral estoppel. Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should

have been advanced in an earlier suit. Claim preclusion therefore encompasses the law of merger and bar.

**\*8** *Id.* (citations omitted). The doctrine of *res judicata* applies to pro se litigants. *See Iwachiw v. New York City Bd. of Educ.,* 194 F.Supp.2d 194, 202 (E.D.N.Y.2002).

Claim preclusion embodies the concept that a judgment between the same parties resolves all other claims arising out of the same transaction. Under claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were *or could have been* raised in that action." *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981) (emphasis added). In applying claim preclusion, "[i]t must first be determined that the second suit involves the same claim-or nucleus of operative fact-as the first suit." *Interoceanica Corp. v. Sound Pilots, Inc.,* 107 F.3d 86, 90 (2d Cir.1997) (internal quotation marks and citation omitted). "To ascertain whether two actions spring from the same 'transaction' or 'claim,' [courts] look to whether the underlying facts are 'related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.' ' *Id.* (quoting Restatement (Second) of Judgments § 24(b)).

A party may not escape claim preclusion by "splitting [her] claim into various suits, based on different legal theories," *Waldman v. Village of Kiryas Joel,* 207 F.3d 105, 110 (2d Cir.2000), because "it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action for *res judicata* purposes, not the legal theory upon which a litigant relies." *Saud v. Bank of New York,* 929 F.2d 916, 919 (2d Cir.1991) (internal quotation marks and citations omitted). Therefore, once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if they are based on different theories or seek different remedies. *See Woods v. Dunlop Tire Corp.,* 972 F.2d 36, 39 (2d Cir.1992) ("It is this identity of facts surrounding the occurrence which constitutes the cause of action, not the legal theory upon which [plaintiff] chose to form her complaint."). Moreover, the "facts essential to the barred second suit need not be the same as the facts that were necessary to the first suit. It is instead enough that 'the facts essential to the second were [already] present

in the first." ' *Waldman,* 207 F.3d at 110-11 (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 126 F.3d 365, 369 (2d Cir.1997)).

On the other hand, collateral estoppel, or issue preclusion, does not depend on a mutuality of the parties. *See Parkland Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 331, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (permitting nonmutual offensive issue preclusion); *Blonder-Tongue Lab, Inc. v. University of Ill. Found.,* 402 U.S. 313, 350, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971) (permitting nonmutual defensive issue preclusion). There are, however, four requirements that must be satisfied before issue preclusion can be applied. Accordingly, "[a] party is collaterally estopped from raising an issue in a proceeding if: (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issues was necessary to support a valid and final judgment on the merits." *Interoceanica,* 107 F.3d at 91 (internal quotation marks and citations omitted).

**\*9** Plaintiff has brought two previous suits in this Court. In *Cabral v. Diaz, Kelly and Ormon,* 97 Civ. 9181(TPG) ("*Cabral I*"), plaintiff brought suit under section 1983 against Officers Diaz, Kelly and Ormon. *See* Complaint dated August 19, 1997 ("1997 Complaint"), Ex. A to Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Second Amended Complaint ("Def.Mem."). In addition to accusations of verbal abuse on the part of Officer Diaz, plaintiff claimed that Officer Diaz "failed and refused to maintain [her] parole records." *Id.* at 4-V. Plaintiff also claimed that Officer Diaz unlawfully subjected her to drug testing on April 16, 1997 and June 18, 1997. *See id.* at 4F-4J. Additionally, plaintiff complained that on October 10, 1995, Officer Kelly imposed a curfew on her, *see id.* at 4-T, and that Officer Diaz imposed a similar curfew on April 16, 1997, *see id.* at 4-L. Plaintiff also complained that Officer Ormon refused to transfer her parole supervision from Officer Diaz. *See id.* at 4S-4T.

On December 15, 1999, then Chief Judge Thomas P. Griesa dismissed the complaint for failure to state a claim on which relief may be granted, having found that plaintiff failed to allege any violations of her federal or constitutional rights. *See* Order of Dismissal, Ex. B to Def. Mem., at 2. In so doing, the Court stated:

Plaintiff's allegations regarding defendants' conduct in supervising her parole must be dismissed. It is well established that a prisoner on parole enjoys only "conditional liberty properly dependent on observance of special parole restrictions." *Morrissey v. Brewer,* 408 U.S. 471, 480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The essence of parole is that a prisoner is released from incarceration prior to the completion of her sentence on the condition that she abides by certain restrictions for the balance of her remaining sentence. *Id.* at 477. A state parole board may properly subject plaintiff "to many restrictions not applicable to other citizens." *Id.* at 482. Thus it is well within the state parole board's discretion to impose on plaintiff conditions she regards as onerous. *Conditions of parole are discretionary and not subject to judicial review in the absence of a showing that the board or its agents acted in an arbitrary and capricious manner. Review of conditions of parole are generally matters for state courts. See* New York Executive Law (McKinney's 1982).

*Id.* (emphasis added).

In 1999, plaintiff filed another section 1983 action against Brion D. Travis and Officers Palumbo and Kelly. *See Cabral v. Travis, Palumbo and Kelly,* 99 Civ. 11986(TPG) ("*Cabral II*"). In that action, plaintiff complained that Officers Palumbo and Kelly imposed a curfew after having a conference regarding plaintiff's parole supervision. *See* Complaint dated September 29, 1999 ("1999 Complaint"), Ex. C. to Def. Mem., at ¶¶ 26-28. Plaintiff claimed that imposition of the curfew constituted an arbitrary and capricious act, and violated her Fourteenth Amendment due process rights. *See id.* ¶ 58.

**\*10** On December 13, 1999, Judge Griesa once again dismissed the complaint, having found it to be meritless. *See* Order of Dismissal, Ex. D to Def. Mem. As in *Cabral I,* Judge Griesa held that: defendants had acted within their discretion in imposing the complained of conditions; parole conditions are not subject to judicial review absent arbitrary and capricious action; and "review of conditions of parole are generally matters for the state courts." *Id.* at 2. The Court concluded by stating:

> Finally, we note that plaintiff is not a stranger to this Court. She previously filed an action with similar allegations concerning her

parole. *See Cabral v. Diaz,* No. 97 Civ. 9181(TPG) (S.D.N.Y. Dec. 15, 1997). Plaintiff is warned that this Court will not tolerate the continued filing of meritless complaints. It may result in the issuance of an order pursuant to 28 U.S.C. § 1651 barring the acceptance of any future complaints from plaintiff without first obtaining leave of Court.... This warning is necessary in light of the similarities between plaintiff's instant complaint and the prior complaint.

*Id.* at 2-3.

**[1]** **[2]** Many of plaintiff's current causes of action are barred by either claim or issue preclusion. For example, plaintiff's second, third, fourth and fifth causes of action, against defendants Diaz, Kelly, Ormon, Travis and Palumbo for the imposition of the Kelly and Diaz curfews, were specifically raised and rejected in *Cabral I* and *Cabral II.* Claim preclusion therefore requires that these claims be dismissed. Although Officer Fisher was not a defendant in either of the earlier actions, the imposition of the Diaz and Kelly curfews was clearly upheld in those actions. [2] Accordingly, non-mutual defensive issue preclusion bars plaintiff's sixth cause of action against Officer Fisher for the continued imposition of the alleged illegal curfew. For similar reasons, plaintiff's fourteenth, fifteenth and sixteenth causes of action against defendant Travis are collaterally estopped as they too relate to the imposition of the curfews. Plaintiff's addition of new defendants to these causes of action does not prevent the application of *res judicata* to the totality of her curfew-related claims. Plaintiff was under a duty to further investigate the full scope of her curfew claims when she brought them in *Cabral I* and *II. See Saud,* 929 F.2d at 921 ("[E]ven if [plaintiff] did not know the full extent of the Bank's alleged fraud at the time the Guaranty Action was commenced, his pleadings in that suit demonstrated that he had sufficient information to create a duty of further investigation.").

2    Plaintiff's allegation that the curfews were based on misinformation obtained from the Wilson and Pearsall rap sheets does not make the instant claims

new because her grievance is that the curfews were imposed, not the reason for their imposition.

**[3]** **[4]** Plaintiff's claims of unreasonable drug testing were also considered and rejected in *Cabral I.* Claim preclusion therefore shields Officer Diaz from further suit on this claim while issue preclusion prevents plaintiff from re-litigating the issue by naming new defendants. Accordingly, plaintiff's eighth cause of action against Officer Diaz and her ninth and eighteenth causes of action, against Officers Ligon and Travis, respectively, are precluded.

C. Many of Plaintiff's Claims are Time-Barred

**\*11** A section 1983 action must be filed within three years of the date on which the plaintiff becomes aware of the alleged injury. *See Owens v. Okure,* 488 U.S. 235, 251, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989); *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1156 (2d Cir.1995). A section 1983 claim accrues "when the alleged conduct has caused the claimant harm and the claimant knows or has reason to know of the allegedly impermissible conduct and the resulting harm." *Duamutef v. Morris,* 956 F.Supp. 1112, 1119 (S.D.N.Y.1997) (internal quotation marks and citations omitted).

**[5]** **[6]** Plaintiff filed the instant complaint on September 19, 2001. Because section 1983 actions are subject to a three-year statute of limitations, any claim accruing before September 19, 1998 is time-barred. [3] For example, the first part of plaintiff's first cause of action concerns Officer Diaz's alleged failure to document certain data in his Chron Notes between January 22, 1997 and June 18, 1997, and an undated alleged failure to document home visits with plaintiff. These claims are time-barred as plaintiff was aware, in August 1997, that Officer Diaz allegedly failed to properly maintain his records. *See* 1997 Complaint at 4-V. Plaintiff's claim that she did not become aware until July 1999 that her records were not maintained as "legislatively required" must be rejected. *See* ¶ 131.

3    Plaintiff cannot contend that any of the following time-barred claims fall within the "continuing violation" exception to the limitations period. *See, e.g., Cornwell v. Robinson,* 23 F.3d 696, 704 (2d Cir.1994). As plaintiff's complaint makes clear, each of the following claims involves a discrete incident, not an on-going pattern or practice. *See id.* at 704.

Pena v. Travis, Not Reported in F.Supp.2d (2002)
Case 5:16-cv-01393-MAD-TWD   Document 13   Filed 01/31/17   Page 42 of 46
2002 WL 31886175

**[7]** **[8]** **[9]** Plaintiff's second cause of action, concerning the Kelly curfew imposed on October 10, 1995 and lifted on September 29, 1996, is likewise time-barred. Plaintiff's claim that the curfew was imposed because of Pearsall's prostitution convictions does not toll the statute of limitations. This allegation-which addresses the reason why the curfew was imposed-is peripheral to plaintiff's true claim-liberty lost as a result of the curfew. Because plaintiff was aware of the restrictions placed on her liberty at the time the curfew was imposed, her claim accrued, at the latest, on September 29, 1996, well before the September 19, 1998 cut-off. For the same reasons, plaintiff's fifth cause of action, in which she contends that Officer Palumbo's failure to sign or initial the Kelly curfew condition violated her constitutional rights is time-barred. Plaintiff's sixth cause of action-where she claims that Officer Fisher failed to lift the Diaz Curfew after meeting with plaintiff on September 17, 1997-is also time-barred. The same is true for plaintiff's claims regarding the alleged unauthorized approval of curfews by defendant Travis. Plaintiff cannot complain that she did not learn that the curfews were authorized by Travis until approximately January 2000 given that she pled the following in 1999: "In the capacity of chief executive of the Division, Defendant Travis is empowered to prescribe, and does prescribe, the powers and duties of parole officers, and the practices, policies and procedures of the Division and is responsible for the conduct thereof." 1999 Complaint ¶ 5. Obviously, plaintiff was aware of Travis's authority years ago. Accordingly, plaintiff's fifteenth and sixteenth causes of action are time-barred.

**\*12** **[10]** Plaintiff's eighth and ninth causes of action, which allege Fourth Amendment violations stemming from Officers Diaz and Ligon's requests that she submit to drug-testing on April 16 and June 18, 1997 and on November 12, 1997, respectively, are time-barred. Again, the gravamen of plaintiff's claim is that she was subjected to drug-testing and not that the Pearsall rap sheet revealed drug convictions which formed the basis for the testing. Additionally, plaintiff's fourteenth cause of action-against Travis for his failure to personally consider plaintiff's July 1997 request to lift her curfew and cease drug-testing-is time-barred. Plaintiff's eighteenth cause of action, wherein she complains that Travis permitted random drug testing to occur in the absence of probable cause, is time-barred, as the drug testing occurred in 1997, more than three years before plaintiff filed the instant complaint.

### D. Plaintiff Has No Liberty Interest in the Early Discharge of Parole and Thus Her Tenth, Twelfth and Thirteenth Causes of Action Do Not State a Claim Upon Which Relief May Be Granted

The Parole Board has the discretion to discharge a parolee from supervision if it is in the best interests of society. *See* N.Y. Exec. Law § 259-j. In her tenth cause of action, plaintiff claims that Officers Ligon, Ormon and Fisher submitted "materially untruthful representations in plaintiff's early discharge application." Related claims are raised in plaintiff's twelfth and thirteenth causes of action. Plaintiff has failed to identify a constitutionally protected liberty interest. Under the Fourteenth Amendment, an individual may not be deprived of a protected liberty interest without due process. *See* Hewitt v. Helms, 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Accordingly, the first step is to determine whether plaintiff has a constitutionally protected liberty interest in the early discharge of parole. *See* Kentucky Dep't. of Corr. v. Thompson, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989).

**[11]** **[12]** **[13]** Courts have held that because New York's parole provisions leave the question of whether to grant an inmate parole to the discretion of the Parole Board, a parolee has no entitlement to parole. Thus, a plaintiff has no liberty interest in being paroled. *See* Barna v. Travis, 239 F.3d 169, 170-71 (2d Cir.2001) (citing Greenholtz v. Inmates of Nebraska Penal and Corr. Complex, 442 U.S. 1, 11-13, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); Boothe v. Hammock, 605 F.2d 664 (2d Cir.1979)). By analogy, plaintiff has no liberty interest in receiving early discharge from parole, as the statute authorizing early release leaves that determination to the discretion of the Parole Board.[4] Because plaintiff had no liberty interest in early release from parole, this Court need not consider whether plaintiff was afforded due process. Accordingly, plaintiff's tenth, twelfth and thirteenth causes of action are dismissed.[5]

[4]    N.Y. Exec. Law § 259-j states:

   *[I]f the board of parole is satisfied that an absolute discharge from parole or from conditional release is in the best interests of society, the board may grant such a discharge prior to the expiration of the full term or maximum term to any person who has been on unrevoked parole or*

conditional release for at least three consecutive
years.
(emphasis added).

5    Plaintiff also claims that the denial of her request for
early release from parole violated her First, Eighth
and Ninth Amendment rights. These claims can be
summarily dismissed. As stated earlier, a parolee
enjoys only "conditional liberty properly dependent
on observance of special parole restrictions."
*Morrissey,* 408 U.S. at 480. Accordingly, plaintiff's
First Amendment rights to freedom of travel and
association can be abridged by parole restrictions
without implicating a constitutional violation.
Moreover, parole does not constitute cruel and
unusual punishment and, therefore, the denial of
early release from parole does not fall within the
purview of the Eighth Amendment. Finally, the Ninth
Amendment does not confer any independent rights
as it states: "The enumeration in the Constitution,
of certain rights, shall not be construed to deny or
disparage others retained by the people."

### F. Plaintiff's Remaining Causes of Action

#### 1. Inclusion of the Pearsall and Wilson Rap Sheets
**\*13**  **[14]**   **[15]**   The second part of plaintiff's first cause
of action alleges that defendants' systematic concealment
of the Wilson and Pearsall rap sheets was arbitrary,
capricious and constituted an abuse of discretion. ¶ 127.
Unlike plaintiff's claim against Officer Diaz for failure to
maintain adequate parole records, plaintiff is here alleging
a deliberate concealment. Such concealment requires an
affirmative act on defendants' part. As such, it was not
raised or adjudicated in *Cabral I or II.* Moreover, plaintiff
claims that she did not become aware that the Wilson
and Pearsall rap sheets were in her parole file until April
21, 2002, when she received the rap sheets as part of an
Article 78 proceeding. ¶ 132. Accordingly, plaintiff's claim
regarding the concealment of the rap sheets is not time-
barred, nor is it barred by principles of *res judicata.*

**[16]**   There is, however, another reason why this claim
must be dismissed. Plaintiff claims that the inclusion of
the Pearsall and Wilson rap sheets violated her rights to
due process under the Fourteenth Amendment. It was
because of these rap sheets, plaintiff claims, that she
was subjected to curfews and drug testing. *See, e .g.,*
¶¶ 158, 185, 262, 273. But, as the Supreme Court has
stated, "[p]rocess is not an end in itself. Its constitutional
purpose is to protect a substantive interest to which the

individual has a legitimate claim of entitlement." *Olim
v. Wakinekona,* 461 U.S. 238, 250, 103 S.Ct. 1741, 75
L.Ed.2d 813 (1983). Because the imposition of special
conditions is left to the discretion of the Board of Parole
and parole officers, plaintiff does not have a protected
liberty interest in being free from special conditions. *See* 9
N.Y. Comp.Codes R. & Regs., tit. 9, § 8003.3 ("A special
condition may be imposed upon a releasee either prior or
subsequent to release.... Each special condition may be
imposed by a member or members of the Board of Parole,
an authorized representative of the Division of Parole,
or a parole officer."). Accordingly, whether the Pearsall
and Wilson rap sheets were wrongly included in plaintiff's
parole file does not raise a constitutional question-without
a protected liberty interest, this Court need not determine
whether plaintiff's due process rights were violated. The
latter part of plaintiff's first cause of action is therefore
dismissed for failure to state a claim.

#### 2. Falsification of Official State Records
Plaintiff's seventh cause of action alleges that Officer
Diaz falsified plaintiff's parole records by including
information in his Chron Notes from a fictitious detective
at BCI. Plaintiff alleges that Officer Diaz knew the
information was false and nonetheless included it. ¶ 250.
Plaintiff allegedly learned the BCI detective was fictitious
when she spoke to Barbara Freeman of the NYPD on June
30, 2000. Plaintiff's claim, which accrued on the date she
learned of the falsehood, *i.e.,* June 30, 2000, is therefore
not time-barred, nor is it barred by *res judicata.*

**\*14**  **[17]**   Plaintiff's claim is barred, however, for reasons
similar to those relating to the Wilson and Pearsall rap
sheets. Plaintiff has not alleged what harm, if any, flowed
from inclusion of the allegedly false information. Rather,
plaintiff states, in conclusory fashion, that the falsification
of her parole records was so arbitrary, capricious and
abusive as to violate her substantive and procedural rights
under the Fourteenth Amendment. Plaintiff overlooks
the fact that she does not have a due process right to
due process. Whether plaintiff received due process is
irrelevant without a legitimate claim of an entitlement
to protect. Having failed to identify such a protectible
interest, plaintiff's seventh cause of action is also dismissed
for failure to state a claim.

#### 3. Disclosure of Medical Information

**[18]**  Plaintiff alleges that on June 15, 1999, Officer Johnson provided her medical evaluation to the U.S. Probation Department. ¶ 381. Disclosure of this medical information allegedly violated plaintiff's right to privacy under the Fourteenth Amendment. An individual, even one who is on parole, retains a right to privacy which protects "the individual interest in avoiding disclosure of personal matters." *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). However, the right to privacy is not absolute and "its very existence in a particular case depends on a balancing of the severity of any privacy invasion against the state interest in disclosure." *Webb v. Goldstein,* 117 F.Supp.2d 289, 296 (E.D.N.Y.2000).

Defendants argue that disclosure of plaintiff's medical evaluation was perfectly proper in this instance. *See* Def. Mem. at 19. According to defendants, "[p]arole records, including psychiatric records, 'shall be maintained by the Division of Parole and may be made available as deemed appropriate by the chairman for use by the Department of Correctional Services, the Division [of Parole] and the board of parole.' " *Id.* (quoting N.Y. Exec. Law § 259-a(2)). Defendants also argue that "the Division of Parole shall perform functions necessary and proper in furtherance of the objective of maintaining an effective, efficient and fair parole system." *Id.* (citing N.Y. Exec. Law § 259-a(10)). Given the broad scope of duties afforded the Division of Parole, defendants contend that plaintiff has failed to state a cause of action for the unauthorized disclosure of her medical evaluation.

Defendants' argument misses the mark. Plaintiff has alleged that the Division of Parole is prohibited from disclosing a parolee's medical or psychiatric records

under section 259-k of the New York Executive Law.[6] Defendants have responded that section 259-a of the Executive Law permits disclosure of medical records to various entities. What defendants have overlooked is that the United States Department of Probation is not one of the entities listed in the statute as a proper recipient of state parole records. Perhaps there is a valid reason for Officer Johnson's disclosure of plaintiff's medical evaluation but that would constitute an affirmative defense. Defendants may therefore renew their request to dismiss this cause of action in a summary judgment motion after the necessary discovery has taken place. For now, Officer Johnson's disclosure of plaintiff's medical records is presumptively invalid.

[6]  Section 259-k(2) specifically states that "[t]he board shall make rules for the purpose of maintaining the confidentiality of records, information contained therein and information obtained in an official capacity by officers, employees or member of the division or board of parole."

### III. CONCLUSION

**\*15**  Plaintiff's Second Amended and Supplemented Complaint now consists solely of plaintiff's seventeenth cause of action for the unauthorized disclosure of her medical records in violation of her Fourteenth Amendment privacy rights. The remaining causes of action are dismissed. A conference is scheduled for January 9, 2003 at 4:00 p.m.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 31886175

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 213831
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
E.D. New York.

Mary LOPEZ, Plaintiff,

v.

JET BLUE AIRWAYS, Defendant.

No. 12–CV–0057.
|
Jan. 24, 2012.

**Attorneys and Law Firms**

Mary Lopez, Brooklyn, NY, pro se.

*ORDER*

JOHN GLEESON, District Judge.

**\*1** Plaintiff Mary Lopez, appearing *pro se,* files this *in forma pauperis* action asserting that Jet Blue Airways ("JetBlue") violated her rights by failing to provide adequate wheelchair assistance when she flew from New York to Puerto Rico on July 3, 2009. For the reasons discussed below, the complaint is dismissed with prejudice.

BACKGROUND

According to Lopez's complaint and attached exhibits, Lopez was scheduled to travel from New York, New York, to Aguadilla, Puerto Rico, on July 3, 2009 on a JetBlue flight. Compl. Ex. 1. While she was at the airport, JetBlue failed to timely provide her with a wheelchair, which caused Lopez physical and psychological injury. Compl. at 2. Reading her complaint broadly, Lopez asserts that JetBlue's actions violated her rights under the Air Carrier Access Act of 1986, 49 U.S.C. § 41705, and its regulations, 14 C.F.R. § 382 .95.

DISCUSSION

Under 28 U.S.C. § 1915(e)(2)(B), a district court has an independent obligation to review a complaint filed *in forma pauperis* and must dismiss the complaint *sua sponte* if the court determines that the action "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." When an *in forma pauperis* action is *res judicata,* it fails to state a claim upon which relief may be granted and thus § 1915(e)(2)(B) compels its dismissal. *See Cieszkowska v. Gray Line New York,* 295 F.3d 204 (2d Cir.2002). Because I find that the instant action is barred by the doctrine of *res judicata,* I dismiss the complaint.

"Under the doctrine of *res judicata,* once a final judgment has been entered on the merits of a case, that judgment will bar any subsequent litigation by the same parties or those in privity with them concerning the transaction, or series of connected transactions, out of which the [first] action arose." *Cieszkowska,* 295 F.3d at 205 (quoting *Maharaj v. Bankamerica Corp.,* 128 F.3d 94, 97 (2d Cir.1997)) (internal quotation marks omitted) (alterations in original); *accord Waldman v. Village of Kiryas Joel,* 207 F.3d 105, 108 (2d Cir.2000). In other words, later actions will be *res judicata* and subject to dismissal if "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the [parties] or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Pike v. Freeman,* 266 F.3d 78, 91 (2d Cir.2001) (quoting *Monahan v. N.Y.C. Dep't of Corr.,* 214 F.3d 275, 284–85 (2d Cir.2000)) (internal quotation marks omitted) (alterations in original).

The same facts Lopez alleges in the complaint before me form the basis for a prior complaint she filed against the same defendant, JetBlue, on April 6, 2010 in this Court. *See Lopez v. Jet Blue Airways,* 10 Civ. 1552, Dkt. Entry 1. She could have, and did, raise her Air Carrier Access Act claims in that complaint, and I dismissed that action on the merits for failure to state a claim upon which relief may be granted. *See Lopez v. Jet Blue Airways,* No. 10 Civ. 1552, 2010 WL 3311428 (E.D.N.Y.2010), *aff'd,* 662 F.3d 593 (2d Cir.2011). The doctrine of *res judicata* thus squarely bars this action, and I dismiss the complaint pursuant to § 1915(e)(2)(B).

2012 WL 213831

CONCLUSION

**\*2** For the reasons provided herein, the complaint is dismissed with prejudice. Lopez is cautioned not to file additional duplicative actions.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of an appeal. *Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

So ordered.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 213831

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.